# EXHIBIT 1

Part 1

```
RUN DATE: 04/01/2011 Bexar County Centralized Docket System Pg: 1  PGM: DKB4900P
RUN TIME: 15:34:46                                                 JCL: SPPROD
```
_____


                       * D O C K E T   I N F O R M A T I O N *


CAUSE NUM: 2011CI02585

DATE FILED: 02/16/2011        COURT: 225        UNPAID BALANCE:     0.00

TYPE OF DOCKET: INSURANCE

                       * * * S T Y L E * * *

        MIGUEL RISHMAGUE ET AL
            VS ROBERT S WINTER ET AL


ACCOUNT TYPE:              ACCOUNT NO:

ACCESS: 0                  STATUS: PENDING

LIST TYPE: C


                       * L I T I G A N T   I N F O R M A T I O N *

SEQ   LAST /FIRST /MIDDLE NAME          LIT. TYPE/ATTORNEY          DATE


00001 RISHMAGUE MIGUEL                  PLAINTIFF            02/16/2011
                                        00001 PULMAN, RANDALL A


00002 RISHMAGUE R ODDE JALIL            PLAINTIFF            02/16/2011
                                        00001 PULMAN, RANDALL A


00003 UCB PROPERTIES TRUST AND INVERSIONE  PLAINTIFF         02/16/2011
                                        00001 PULMAN, RANDALL A


00004 WINTER ROBERT S                   DEFENDANT           02/16/2011
00005 BOWEN MICLETTE & BRITT INC         DEFENDANT           02/16/2011
00006 BOWEN MICLETTE & DESCANT & BRITT IN DEFENDANT          02/16/2011
00007 BARANOUCKY AMY S                  DEFENDANT           02/16/2011
00008 WILLIS OF COLORADO INC            DEFENDANT           02/16/2011
00009 WILLIS GROUP HOLDINGS LTD         DEFENDANT           02/16/2011
00010 ALEMAN JAIME                      DEFENDANT           02/16/2011
00011 ALEMAN GALINDO CORDERO & LEE TRUST  DEFENDANT          02/16/2011
00012 ALEMAN GALINDO CORDERO & LEE TRUST  DEFENDANT          02/16/2011
00013 ALEMAN GALINDO CORDERO AND LEE     DEFENDANT           03/09/2011
00014 WILLIS OF TEXAS INC               DEFENDANT           03/09/2011


                       * S E R V I C E S   I N F O R M A T I O N *

SEQ   SERVICE TYPE / DATES              DIST   LITIGANT NAME


00001 CITATION                          4
         ISS: 03/10/2011  REC: 03/18/2011  EXE: 03/18/2011  RET: 03/24/2011


00002 CITATION                          4
         ISS: 03/10/2011  REC:          EXE:          RET:


00003 CITATION                          4
         ISS: 03/10/2011  REC: 03/18/2011  EXE: 03/18/2011  RET: 03/24/2011


00004 CITATION                          4    ALEMAN JAIME
         ISS: 03/10/2011  REC: 03/18/2011  EXE: 03/18/2011  RET: 03/24/2011

RUN DATE: 04/01/2011 Bexar County Centralized Docket System Pg: 2  PGM: DKB4900P

RUN TIME: 15:34:46                                                 JCL: SPPROD

---

00005 CITATION                      4    WINTER ROBERT S
          ISS: 03/10/2011  REC:       EXE:         RET:


00006 CITATION                      4
          ISS: 03/10/2011  REC: 03/24/2011  EXE: 03/24/2011  RET: 03/28/2011


00007 CITATION                      4    BARANOUCKY AMY S
          ISS: 03/10/2011  REC: 03/18/2011  EXE: 03/18/2011  RET: 03/24/2011


00008 CITATION                      4
          ISS: 03/10/2011  REC: 03/18/2011  EXE: 03/21/2011  RET: 03/24/2011


00009 CITATION                      4
          ISS: 03/10/2011  REC: 03/18/2011  EXE: 03/21/2011  RET: 03/24/2011


### * A T T O R N E Y   I N F O R M A T I O N *

| SEQ | DATE FILED | BAR NBR. | NAME | STATUS | DATE |
|---|---|---|---|---|---|
| 00001 | 02/16/2011 | 16393250 | PULMAN, RANDALL A | SELECTED | 02/17/2011 |


### * P R O C E E D I N G   I N F O R M A T I O N *

| SEQ | DATE FILED | REEL | IMAGE | PAGE COUNT |
|---|---|---|---|---|
| 00001 | 02/16/2011 | 0000 | 0000 | 0000 |
| | DESC: PLAINTIFF'S ORIGINAL PETITION | | | |
| 00002 | 02/16/2011 | 0000 | 0000 | 0000 |
| | DESC: CIVIL CASE INFORMATION SHEET | | | |
| 00003 | 03/09/2011 | 0000 | 0000 | 0000 |
| | DESC: FIRST AMENDED PETITION | | | |
| | OF MIGUEL RISHMAGUE AND ODDE JALIL | | | |
| | RISHMAGUE R, INDIVIDUALLY | | | |
| 00004 | 03/10/2011 | 0000 | 0000 | 0000 |
| | DESC: SERVICE ASSIGNED TO CLERK 3 | | | |
| 00005 | 03/10/2011 | 0000 | 0000 | 0000 |
| | DESC: REQUEST FOR | | | |
| | CIT/3 CITS SOS PPS | | | |
| 00006 | 03/10/2011 | 0000 | 0000 | 0000 |
| | DESC: REQUEST FOR | | | |
| | 4 CITS/CIT SOS PPS | | | |
| 00007 | 03/30/2011 | 0000 | 0000 | 0000 |
| | DESC: FAX TRANSMITTAL/RECORDING DEPT | | | |
| | LEE HANEL | | | |
| 00008 | 03/30/2011 | 0000 | 0000 | 0000 |
| | DESC: COPY MAILED OUT OF | | | |
| | PETITION PAGES 1-5 | | | |
| | FAXED TO LEE HANEL | | | |
| | 713-869-0677 | | | |


### * T R I A L   I N F O R M A T I O N *

| SEQ | DATE FILED | COURT | SETT. DATE | TIME | ATTY |
|---|---|---|---|---|---|

Filed
11 March 9 P4:36
Donna Kay McKinney
District Clerk
Bexar District
Accepted by:
Jennifer Contreras

CAUSE NO. 2011-CI-02585

| | | |
|---|---|---|
| MIGUEL RISHMAGUE AND ODDE JALIL RISHMAGUE R., INDIVIDUALLY AND AS REPRESENTATIVE FOR THE UCB PROPERTIES TRUST AND INVERSIONES MISANISA TRUST, | § § § § § | IN THE DISTRICT COURT |
| PLAINTIFFS | § § § | |
| V. | § § | |
| ROBERT S. WINTER; BOWEN, MICLETTE & BRITT, INC. F/K/A BOWEN, MICLETTE, DESCANT & BRITT, INC.; AMY S. BARANOUCKY; WILLIS OF COLORADO, INC.; WILLIS OF TEXAS, INC.; WILLIS GROUP HOLDINGS, LTD.; JAIME ALEMAN; ALEMAN, GALINDO, CORDERO & LEE; AND ALEMAN, GALINDO, CORDERO & LEE TRUST (BVI) LIMITED, | § § § § § § § § § § § § | 225TH JUDICIAL DISTRICT |
| DEFENDANTS | § § | BEXAR COUNTY, TEXAS |

---

### PLAINTIFFS' FIRST AMENDED PETITION

---

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Miguel Rishmague and Odde Jalil Rishmague R., individually and on behalf of

UCB Properties Trust and Inversiones Misanisa Trust, complaining of Robert S. Winter;

Bowen, Miclette & Britt, Inc. f/k/a Bowen; Miclette, Descant & Britt, Inc.; Amy S. Baranoucky;

Willis of Colorado, Inc.; Willis Group Holdings, Ltd.; Jaime Aleman; Aleman, Galindo,

Cordero & Lee Trust; and Aleman, Galindo, Cordero & Lee Trust (BVI) Limited and would

respectfully show unto the Court the following:

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

# I. Discovery Level

1.     The Plaintiffs intend for discovery to be conducted under Level 3 pursuant to Tex. R. Civ. P. 190.4.

# III. Parties

## A. Plaintiffs

2.     Plaintiff Miguel Rishmague ("M. Rishmague") is a citizen of the United States of America and resident of Florida.

3.     Plaintiff Odde Jalil Rishmague R. ("O. Rishmague") is a citizen of Chile.

## B. Defendants

### (i) Insurance Defendants

4.     Defendant Robert S. Winter ("Winter") is an individual residing at 10015 Olympia Drive, Houston, Harris County, Texas  77042.  Winter may be served with process by serving him at his usual place of abode, or wherever he may be found.

5.     Defendant Bowen, Miclette & Britt, Inc. ("BMB") is a corporation organized under the laws of Texas, with its principal office at 1111 North Loop West, Suite 400, Houston, Harris County, Texas  77008.  BMB may be served with process by servings its registered agent, CT Corporation System, at 350 North St. Paul Street, Dallas, Texas  75201.

6.     Defendant Amy S. Baranoucky ("Baranoucky") is an individual and, upon information and belief, a United States citizen, currently residing in 4295 Columbine Drive, Unit 8, Vail, Colorado  81657-4767.  Baranoucky may be served with process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Tex. R. Civ. P. 106 and 108a, and forwarded to Baranoucky's residence.  This Court has jurisdiction over Ms. Baranoucky pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.042.  Ms. Baranoucky

   © 2011 Pulman, Cappuccio, Pullen & Benson, LLP

purposefully availed herself of Texas law by obtaining a license to sell insurance in Texas and actually selling policies in Texas. Ms. Baranoucky also made numerous contacts with SIB's office in Texas and sent Safety and Security letters directly to Texas residents and/or to SIB offices located in Texas for dissemination to other SIB depositors or potential depositors, including Plaintiffs. Her contacts were purposeful, consistent, and ongoing. She sought benefit, advantage or profit from these contacts because she sought to maintain her business relationships with SIB and provided information to the Plaintiffs for her own pecuniary benefit.

7.      Defendant Willis of Texas, Inc. ("Willis of Texas") is a Texas corporation and may be served with process by serving its registered agent, CT Corporation System, at 350 North St. Paul Street, Ste. 2900, Dallas, Texas 75201-4234.

8.      Defendant Willis of Colorado, Inc. ("Willis of Colorado") is a corporation organized the laws of Colorado. Willis of Colorado has engaged in business in the State of Texas, and maintains a designated agent for service of process in Texas. Willis may be served with process by servings its registered agent, CT Corporation System, at 350 North St. Paul Street, Dallas, Texas 75201. This Court has jurisdiction over Willis of Colorado pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042.

9.      Defendant Willis Group Holdings, Ltd. ("Willis Group") is a corporation organized under the laws of Bermuda, with its principal place of business at 51 Lime Street, London, EC3M 7DQ, England, in the United Kingdom. Willis has engaged in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in Texas. Willis Group may be served with process by service on the Secretary of State. Willis Group may also be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163

    © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

(1965). Willis Group may be served by serving its registered agent in Bermuda: Appleby, Canon's Court, 22 Victoria Street, Hamilton, Bermuda. This Court has jurisdiction over Willis Group pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042. Willis Group made numerous contacts, directly or indirectly through its agents, with SIB's office in Texas and sent letters, directly or throught its agents, to Texas residents and/or to SIB offices located in Texas for dissemination to other SIB depositors or potential depositors, including Plaintiffs. Its contacts were purposeful, consistent, and ongoing. It sought benefit, advantage or profit from these contacts because it sought to maintain its business relationships with SIB and provided information to the Plaintiffs for its own pecuniary benefit.

### (ii) Co-Trustee Defendants

10.     Defendant Aleman, Galindo, Cordero & Lee Trust (BVI) Limited ("Aleman Trust Company") is a British Virgin Islands private trust company, or in the alternative, is an entity organized under the laws of the British Virgin Islands capable of bringing suit and being sued in its own name, with its principal place of business in the British Virgin Islands. This Court has jurisdiction over Aleman Trust Company pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042. Aleman Trust Company is subject to personal jurisdiction in this Court to hear a suit related to its liability for losses suffered by these Plaintiffs. Aleman Trust Company's specific contacts with SIB and STC in Texas and its service as Co-Trustee of the trusts at issue in this lawsuit was purposeful, consistent and ongoing, and it sought benefit, advantage and profit when it was paid fees to serve as Co-Trustee of such trust. The situs of administration of the trust at issue in this lawsuit and of which Aleman Trust Company was Co-Trustee was in Texas and was largely managed from Texas in coordination with the Aleman Trust Company. Aleman Trust Company contracted with one or more Texas residents to perform part of a contract in Texas when

it took on the duty to make reasonable inquiry into the affairs of Stanford International Bank. By breaching those trust contracts, Aleman Trust Company conducted business in Texas. Aleman Trust Company has engaged in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in Texas. Aleman Trust Company may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, which was signed by the United Kingdom and made applicable by that country to the British Virgin Islands. Aleman Trust Company may be served by any method authorized under the Hague Convention, the laws of Texas, and the laws of the British Virgin Islands, including service upon the appropriate officer of Aleman Trust Company at its principal place of business at 3rd Floor, Geneva Place, 333 Waterfront Drive, P. O. Box 71, Road Town, Tortola, British Virgin Islands. Service upon Aleman Trust Company may also be effected by service upon Gabriella Conte, Registered Agent for Aleman Trust Co., at P. O. Box 3175, Road Town, Tortola, British Virgin Islands. Service upon Aleman Trust Company may also be effected by service upon Jaime Aleman wherever he may be found.

11. Defendant Aleman, Galindo, Cordero & Lee ("Aleman Firm") is an entity or association whose principle place of business is in the Republic of Panama. Upon information and belief, the Aleman Firm is a general partnership. This Court has jurisdiction over the Aleman Firm pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042. The Aleman Firm made numerous contacts with Texas residents and/or businesses. Its contacts were purposeful, consistent, and ongoing. The firm sought benefit, advantage or profit from these contacts because it obtained pecuniary benefit from serving as trustee for the trusts at issue in this lawsuit. The firm also worked with others to commit torts in Texas in whole or in part. The Aleman Firm has engaged in business in the State of Texas, but does not maintain a regular place of business in Texas or a

– 5 –

designated agent for service of process in Texas. Therefore, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044, substituted service should be made on the Aleman Firm by serving the Secretary of State, Statutory Documents Section, Citations Unit, P. O. Box 12079, Austin, Texas 78711-2079, and forwarded to the Aleman Firm's principal place of business at 2nd Floor, East 53rd Street, Ur. Marbella, P. O. Box 0819-09132, Panama City, Republic of Panama. Service on the Aleman Firm can be effected pursuant to methods permitted by the Inter-American Convention on Letters Rogatory and Additional Protocol, or by any other method permitted under the laws of the State of Texas and the Republic of Panama. The Aleman Firm may also be served by effecting service on Jaime Aleman in the manner described below. Aleman is a general partner, officer, manager, agent, or other appropriate person to receive service on behalf of the Aleman Firm.

12.     Defendant Jaime Aleman is an individual residing in Panama City, Panama. Mr. Aleman is licensed to practice law in the United States, and is a member of the bar of the District of Columbia. This Court has jurisdiction over Aleman pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042. Aleman made numerous contacts with Stanford Investors in and/or from Texas. His contacts were purposeful, consistent, and ongoing. He sought benefit, advantage or profit from these contacts because he obtained pecuniary benefit from the service of his associated entities, Aleman Trust and the Aleman Firm, who served as trustee for trusts at issue in this lawsuit. He also worked with others to commit torts in Texas in whole or in part. Aleman has engaged in business in the State of Texas, but does not maintain a regular place of business in Texas or a designated agent for service of process in Texas. Therefore, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044, substituted service should be made on Aleman by serving the Secretary of State, Statutory Documents Section, Citations Unit, P. O. Box 12079, Austin, Texas 78711-2079, and forwarded to Aleman's usual place of business at 2nd Floor, East 53rd Street,

Ur. Marbella, P. O. Box 0819-09132, Panama City, Republic of Panama. Service on Aleman can be effected pursuant to methods permitted by the Inter-American Convention on Letters Rogatory and Additional Protocol, or by any other method permitted under the laws of the State of Texas and the Republic of Panama. Service upon Aleman may also be effected by serving him by mail at the address he maintains with the District of Columbia Bar Association at P. O. Box 0819-09132, Panama City, Panama.

## IV. JURISDICTION & VENUE

13.     This Court has jurisdiction to hear this case because the Plaintiffs request damages and remedies in excess of the minimum jurisdictional limits of this Court. In addtion, this Court has original and exclusive jurisdiction pursuant to TEX. PROP. CODE § 115.001 because this is an action against a trustee and/or concerning trusts. Further, the claims asserted herein and parties to this action do not give rise to federal court jurisdiction and thus preclude removal to the federal courts.

14.     Venue is proper in Bexar County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1) because all or a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in Bexar County, Texas.

15.     Pleading in the alternative, to the extent necessary, venue for this suit is proper in Bexar County, Texas pursuant to TEX. PROP. CODE § 115.002. The Trustee of the trust at issue herein was Stanford Trust Company or Stanford Trust Company Limited d/b/a Stanford Fiduciary Investor Services, or some other affiliated entity, which were corporate trustees. Stanford Fiduciary Investor Services maintained an office in Bexar County, Texas. This Bexar County, Texas office was the situs of administration of the trusts at issue in this lawsuit, and thus Bexar County, Texas is the proper place of venue for this suit pursuant to TEX. PROP. CODE § 115.001.

16.     Pleading in the alternative, to the extent necessary, venue is proper in Bexar County because Willis of Texas operates its business in Bexar County, Texas.

## V. INTRODUCTION

17.     Sir R. Allen Stanford built Stanford International Bank, Ltd. ("**SIB**") into an $8 billion dollar enterprise that attracted 30,000 investors from the United States, Mexico, Venezuela, and dozens of other countries.  On February 17, 2009, the Securities and Exchange Commission filed a lawsuit in the United States District Court for the Northern District of Texas that shut down SIB once and for all, calling it "a massive Ponzi scheme." Many unanswered questions remain about how Stanford, a former gym operator from Mexia, Texas, came to operate a multi-faceted financial empire from the Caribbean island nation of Antigua and Barbuda, but the one thing that can be said for sure is that, much like a turtle sitting on top of a fence post, he did not get there all by himself.

18.     SIB posed as a "safe" bank which, according to the Insurance Defendants' continuous and repeated assurances, was backed by well-placed insurance policies and/or coverages from reputable carriers conditioned on "stringent risk management reviews." These repeated irresponsible and wholly misleading statements were made to current and potential depositors, including Plaintiffs, by the Insurance Defendants on behalf of SIB without proper disclosure, with total disregard for their intentionally misleading nature, and for the specific purpose of advancing the interests of SIB and themselves at the expense of innocent depositors.

19.     Robert Winter, Bowen, Miclette & Britt, Inc., Amy S. Baranoucky, the Willis Group, and Willis of Colorado (collectively the "Insurance Defendants"), held themselves out as "Insurance and Risk Managers" to the depositors as the persons and/or entities responsible for performing those functions for SIB. For years, the Insurance Defendants consented, allowed, and/or

encouraged SIB to list them on SIB's publicly distributed Financial Statements as "Insurance & Risk Managers" for SIB despite such financial statements being patently false and serving only as yet another misleading marketing tool for SIB. *See, e.g.,* Exhibit "A" at p. 19, 2007 SIB Annual Report. For example, the following is an excerpt of SIB's 2007 annual report regarding "LIQUIDITY RISK":

| AT 31 DECEMBER 2007 | ASSETS UP TO 1 MONTH | 1-3 MONTHS | 3-6 MONTHS | 6-12 MONTHS | OVER 12 MONTHS | NON-INTEREST-BEARING | TOTAL |
|---|---|---|---|---|---|---|---|
| Cash and Balances with Other Banks | $ 627,322,483 | $ 0 | $ 0 | $ 0 | $ 0 | $ 500,000 | $ 627,822,483 |
| Financial Assets at Fair Value | 5,636,685,438 | 197,098,866 | 25,289,803 | 80,451,575 | 408,105,892 | 0 | 6,347,631,574 |
| Loans and Advances to Clients | 69,732,601 | 0 | 0 | 0 | 0 | 0 | 69,732,601 |
| Property and Equipment | 0 | 0 | 0 | 0 | 0 | 6,910,778 | 6,910,778 |
| Other Assets | 0 | 0 | 0 | 0 | 0 | 5,785,277 | 5,785,277 |
| TOTAL ASSETS | $ 6,333,740,522 | $ 197,098,866 | $ 25,289,803 | $ 80,451,575 | $ 408,105,892 | $ 13,196,055 | $ 7,057,882,713 |
| LIABILITIES | | | | | | | |
| Deposits from Clients | 480,040,692 | 530,340,338 | 716,474,596 | 1,107,864,300 | 3,855,244,377 | 0 | 6,689,964,303 |
| Other Liabilities | 0 | 0 | 0 | 0 | 0 | 12,996,649 | 12,996,649 |
| TOTAL LIABILITIES | $ 480,040,692 | $ 530,340,338 | $ 716,474,596 | $ 1,107,864,300 | $ 3,855,244,377 | $ 12,996,649 | $ 6,702,960,952 |
| NET LIQUIDITY GAP | $ 5,853,699,830 | $ (333,241,472) | $ (691,184,793) | $ (1,027,412,725) | $ (3,447,138,485) | $ 199,406 | $ 354,921,761 |
| AT 31 DECEMBER 2006 | | | | | | | |
| Total Assets | $ 4,459,272,893 | $ 51,283,001 | $ 15,366,000 | $ 55,867,001 | $ 740,876,015 | $ 13,652,537 | $ 5,336,317,447 |
| Total Liabilities | $ 383,888,899 | $ 446,715,265 | $ 213,738,713 | $ 1,203,585,335 | $ 2,762,155,554 | $ 14,930,484 | $ 5,025,014,250 |
| NET LIQUIDITY GAP | $ 4,075,383,994 | $ (395,432,264) | $ (198,372,713) | $ (1,147,718,334) | $ (2,021,279,539) | $ (1,277,947) | $ 311,303,197 |

*Id.* at p.11. As indicated in the Liquidity Risk Statement above (issued in the final annual report released by SIB before its house of cards began to unravel), SIB claimed it had over $6.3 billion in "Financial Assets at Fair Value," of which over $5.6 billion were capable of liquidation (convertible to an "on-demand" asset such as cash) within one month. Of course we now know this statement was false and merely served as part of SIB's continued smoke and mirrors campaign to lull depositors into believing their deposits were safe and secure in order to prevent withdrawals and encourage more deposits into SIB's deepening funnel of deceit. The Insurance Defendants, by allowing themselves to be represented as purported "Risk Managers," implied that they had supported, reviewed, and/or validated the risks, including liquidity risk, within the annual reports.

To further validate the SIB scheme, the Insurance Defendants, through the SIB financial statements and through "Safety and Security Letters," declared SIB was covered by "Depository Insolvency," "Excess FDIC Insurance," and "Bankers Blanket Bond" insurance coverages. The SIB financial statements provide:

> The insurance coverage of the Bank includes Property and Casualty, Worldwide Package, Vehicle, Workers' Compensation and Travel Accident coverage. Financial coverage includes Banker's Blanket Bond, Director' and Officers' Liability, and Errors and Omissions Liability. The Bank also maintains Depository Insolvency coverage for its correspondent banks.
>
> The Bank's insurance program is independently reviewed. The latest review was performed by Stogniew & Associates, an independent risk management consultant. The primary objective of each review is to provide assurance that the risk management and internal controls currently implemented minimize the Bank's exposure to loss. The most recent assessment stated that the Bank had reasonable internal controls and risk management systems in place and found no material weaknesses in these areas.

Exhibit "A" at p.13, Note 2.6. SIB and the Insurance Defendants wanted the Plaintiffs to believe that the risk management reviews, internal controls, and insurance program were "reasonable," "minimize[d] the bank's exposure to loss," and were without "material weakness." To further particularize their participation in the SIB scheme, the Insurance Defendants personally sent "Safety & Security Letters" addressed to SIB depositors that, like the financial statements, were intended to lead the depositors to believe that there were insurance policies and/or coverages protecting the depositors' interests. Instead, what little insurance coverage existed was there to protect the bank's shareholder R. Allen Stanford, his assets, and his close friends and advisors, not SIB's depositors.

20.     The risk management reviews referred to in the Insurance Defendants' letters and in the SIB financial statements were presumably the same ones performed by Stogniew & Associates

that SIB described in its financial statements. *See, e.g.,* Exhibit "A" at Note 2.6, p. 13, 2007 SIB Financial Statement. Yet, even a perfunctory review by the Insurance Defendants of the alleged "stringent risk management review" performed by Stogniew & Associates in June of 2003 would have revealed the following:

> **THE RISK SURVEY WAS NOT CONDUCTED FOR THE PURPOSE OF EXPRESSING AN OPINION ON STANFORD'S FINANCIAL STATEMENTS, INTERNAL CONTROL, RISK MANAGEMENT SYSTEMS OR OPERATING PROCEDURES, AND WAS LIMITED TO OBTAINING INFORMATION PERTINENT TO THE UNDERWRITING OF INSURANCE POLICIES PURCHASED BY STANFORD.**

First, the Stogniew Risk Survey was addressed to and only for the benefit of the "Underwriters of Lloyd's." Furthermore, Stogniew's last reviews of the bank were conducted in 2003. Even if the reviews had been adequate to back up SIB and the Insurance Defendants' claims, which they were not, they were so out of date as to be worthless. In addition, the cover letter of the Risk Survey states that the surveyor "did not independently test the effectiveness of the internal controls, risk management systems or the accuracy of the financial reports." This can hardly serve as the measuring stick by which to claim the review was "stringent." Accordingly, the publicly distributed SIB financial statements and the Safety and Security Letters are littered with false and misleading statements that have no justification other than to further the interests of SIB and the Insurance Defendants at the expense of the SIB depositors and/or potential depositors. It is likely that Defendant Winters and Defendant Baranoucky never even saw any Stogniew Risk Survey.

21.     The Insurance Defendants were the ones responsible for placing the insurance coverages, and the Insurance Defendants represented to all of the SIB depositors (including Plaintiffs) through the SIB financial statements and Safety and Security Letters that the coverages had been placed. The Insurance Defendants were insurance professionals who provided

professional services to SIB and who are liable to the Plaintiffs under the Texas Insurance Code and Colorado Consumer Protection Act for the roles they played at SIB. Each of the Insurance Defendants is liable to the Plaintiffs for the negligent misrepresentations they made about deposit insurance coverages at SIB. The Defendants are responsible for the Plaintiffs' lost deposits in the amount of $9,273,773.00.

22. R. Allen Stanford set up a number of trust companies such as Stanford Trust Company ("STC") and Stanford Trust Company, Ltd. ("STC,L") doing business as Stanford Fiduciary Investor Services ("SFIS") (collectively the "Trust Companies") to serve as the trustee of trusts settled by some of the Plaintiffs and to further lure depositors into purchasing Stanford CDs. The Trust Companies worked with a co-trustee, Aleman, Cordero, Galindo & Lee Trust (BVI) Limited, and its leadership to promote the purchase of Stanford CDs. The trustee companies and their employees also profited from their service as trustees and breached fiduciary duties they owed to the Plaintiffs. The Co-Trustee Defendants, and their principals and employees are liable to the Plaintiffs for damages in the amount of $9,273,773.00

## VI. FACTS

*Stanford International Bank*

23. The Plaintiffs made deposits at SIB and purchased certificates of deposit ("Stanford CDs"). At the time SIB was placed in receivership, the bank had taken in $7.2 billion in deposits from over 20,000 investors. The Plaintiffs lost $9,273,773.00 of those deposits.

24. Stanford CDs were carefully crafted to seem like normal financial instruments, bearing favorable but not unreasonable rates of return and a high level of security. Most Stanford CDs purchased by the Plaintiffs bore stated annual rates of return of five to

six percent interest, and came with typical restrictions one would expect to find on a bank CD, such as penalties for early withdrawal.

25.     To market the Stanford CDs, the bank produced elaborate marketing materials including websites, financial statements, and prospectuses. *See, e.g.,* Exhibit "A." R. Allen Stanford built a corresponding network of financial companies including Stanford Financial Group, a registered broker-dealer, Stanford Trust Company, and other companies offering financial services, products, and investments to expand the scope of SIB and the Stanford CD enterprise.

26.     Plaintiffs purchased Stanford CDs through their accounts at Stanford Trust Company ("STC"), which also did business under the name Stanford Fiduciary Investor Services (and other similar names).   These trust companies did little, if anything, other than promote the sale of Stanford CDs.

27.     The Trust Companies are now in receivership along with SIB, the broker-dealer, and other Stanford companies.  Thus, the trust companies are incapacitated to serve as trustees, and they are unable to prosecute claims related to the Stanford CDs on behalf of their trusts because their role in the sale of CDs gives rise to a conflict.

28.     SIB made a number of vital statements to depositors about the presence of insurance. First, SIB held out to the world year after year that its deposits were secure and that insurance protected the deposits.   Second, SIB and the Defendants Winter, BMB, Baranoucky, Willis of Colorado, and Willis Group claimed that the bank underwent "stringent risk management reviews" which formed their bases for providing certain insurance coverages.  This statement was patently false.  The truth of the matter is that these Defendants never even reviewed the material that they were allegedly relying upon.  Third, SIB used its website, financial statements, and prospectuses to publish thousands of times over the names of its risk management and insurance professionals, *i.e.,*

Robert Winter, Bowen, Miclette & Britt, Inc., Amy S. Baranoucky, Willis of Colorado, and Willis Group.

29.     The extent to which depositors relied on the presence of insurance to protect their deposits held by SIB cannot be overstated.  For example, as early as October of 1999, more than six months prior to Plaintiffs' agreeing to deposit funds with SIB and after M. Rishmague's repeated inquiries into the safety and security of investments held with SIB, a Safety and Security Letter was sent directly to M. Rishmague from Defendant BMB touting the safety and security of investments with SIB and providing information regarding certain purported insurance coverages obtained only after completion of a risk management review.  On several occasions, M. Rishmague personally met with SIB executives and specifically discussed the existence of certain insurance coverages. During one meeting at an SIB office which James Davis, Chief Financial Officer of SIB, attended by way of conference call, M. Rishmague was repeatedly assured of the presence of insurance provided by Lloyd's of London and was shown yet another Safety and Security Letter.  It was only after this meeting and in reliance on the repeated assurances that SIB was adequately insured that the Rishmagues decided to begin depositing funds into SIB accounts under the UCB Properties Trust and Inversiones Misanisa Trust names.

30.     In 2003, Plaintiff M. Rishmague was compelled to visit the SIB bank in Antigua to see the operation first hand.  He personally met with the president of the bank, Mr. Juan Rodriguez-Tolentina, who touted the "extreme liquidity" of the bank and the presence of the insurance coverages as declared in the Safety and Security Letters.  In 2005, M. Rishmague revisited the Antiguan bank to meet with Mr. Juan Rodriguez-Tolentina.  At this meeting, the same assurances and representations were made to M. Rishmague regarding liquidity and insurance coverages, only this time M. Rishmague was informed that Willis, which had now assumed responsibility over the

insurance and risk management functions of SIB in place of BMB, had performed an audit on the Bank. The Willis audit was used by Mr. Juan Rodriguez-Tolentina to reinforce his assurances to M. Rishmague that the UCB Properties Trust and Inversiones Milanisa Trust were safe and secure. Indeed Willis itself provided as much each time a Safety and Security Letter was presented to a depositor on Willis' letterhead. Insurance protection was so vital to the Rishmagues' decision to deposit and maintain funds with SIB that, in addition to his personal trips to Antigua and multiple meetings with SIB executives, M. Rishmague also ensured he reviewed a current Safety and Security Letter with his advisor with STC each year after the establishment of the UCB Properties Trust and the Inversiones Misanisa Trusts with SIB in May of 2000 and March of 2001, respectively.

### *The Insurance Professionals*

31.     BMB and Robert Winter served SIB as insurance brokers and risk management advisors from as early as the mid-1990s and until 2002 or later. They not only purportedly placed coverage for SIB and consulted for SIB on risk management strategy, they also allowed themselves to be listed on SIB's financial statements as "Insurance and Risk Managers" (subscribing to and further validating the information contained in the financial statements) and personally published information about certain insurance coverages to the Plaintiffs by sending out thousands of "Safety and Security Letters" as part of and in conjunction with SIB's marketing scheme.

32.     Willis Group, Willis of Colorado, Willis of Texas (collectively "Willis"), and Amy Baranoucky undertook a similar role for SIB, serving as insurance brokers and risk managers from 2002 through 2005, and sending out similar letters.

33.     The Safety and Security Letters are well crafted for their purpose – to perpetuate fraud. The letters sent on BMB stationary were signed by insurance broker and BMB employee, "Robert S. Winter, Financial Specialist," at a firm which purported to offer services in

"Insurance/Bonds/Risk Management." The letters say that based on Winter and BMB's knowledge, SIB was composed of "first class business people." The letters specifically describe up to four different types of insurance coverage placed at allegedly "A" rated underwriters, *i.e.*, Lloyd's of London, General Star Indemnity, and Great American Insurance, Co. The letters describe risk management reviews (sometimes described as "stringent" risk management reviews) by an outside firm, and the letters make it clear that the risk management reviews were material to obtaining the represented coverage.

34.     Remarkably, the Baranoucky and Willis letters use the same language as the BMB and Winter letters. Baranoucky and Willis' letters continued to tout the benefits of "stringent risk management reviews" and the "first class business people" at SIB.

35.     The Safety and Security Letters were a *quid pro quo* given by Willis and BMB to SIB in exchange for the privilege of selling insurance to Stanford and his entities and collecting a handsome commission. BMB and Willis knew that SIB and Stanford used the Safety and Security Letters to ensure that a critical mass of depositors would keep their monies with SIB. The Safety and Security Letters were either addressed to individual depositors or distributed in mass to the remaining depositors. These letters were a part of the marketing campaign used to give SIB credibility while it continued to take in new deposits and promote the classic Ponzi scheme.

*The Business of Insurance*

36.     The Insurance Defendants engaged in conduct constituting the business of insurance in Texas. Among other things, the Insurance Defendants:

    a.  made and proposed to make insurance contracts;

    b.  made and proposed to make guaranty or surety contracts;

    c.  took or received insurance applications;

    d.   received premiums and commissions;

    e.   issued and delivered insurance contracts to residents of this state;

    f.   assisted insurers and persons in soliciting, negotiating, procuring and effectuating insurance and renewals of insurance;

    g.   assisted insurers and persons in disseminating information relating to coverage;

    h.   assisted insurers and persons in transacting a matter after the effectuation of the contract; and

    i.   did and proposed to do insurance business that was in substance equivalent to conduct described at TEX. INS. CODE § 101.051(b)(1)-(8) in a manner designed to evade statutes relating to insurance.

This conduct in the business of insurance was part and parcel of the Insurance Defendants' misrepresentations to the Plaintiffs. Thus, each use (*e.g.*, mailing or display) of a Safety and Security Letter by the Insurance Defendants to Plaintiffs, each failure to correct a misstatement which the Insurance Defendants had a duty to correct, and many other acts by the Insurance Defendants were also conduct in the business of insurance.

    37.   The Safety and Security Letters misrepresented the benefits of the insurance policies held by SIB. The letters were sent to Plaintiffs to encourage them to leave their money at SIB. The insurance professionals who sent these letters intended for Plaintiffs to believe that these purported policies contained in the letters would protect the Plaintiffs when, in fact, the policies protected only SIB and its sole shareholder, R. Allen Stanford.

    38.   The Safety and Security Letters used a name or title of an insurance policy that misrepresented the true nature of the policy. The letters describe policies or coverages using terms such as "Bankers Blanket Bond," "Excess FDIC Insurance," and "Depository Insolvency" in order to lead the Plaintiffs and other depositors to believe that their deposits at SIB would be covered when, in fact, they were not. Use of each these terms were stand alone misrepresentations in and of

themselves because no such coverage or protection against Plaintiffs' loss existed when these representations were made. To the extent that any of these coverages did actually exist, then, upon information and belief, such coverages were wholly inadequate to represent that such coverage protected the depositors interests.

39.     The Safety and Security Letters contained further untrue, deceptive, and misleading representations regarding SIB, the Insurance Defendants, and the business of insurance. The Safety and Security Letters made untrue statements of material fact. Among other things, SIB was not made up of what any reasonable person would call "first class business people." There were no risk management reviews, or in the alternative, what reviews there may have been were far from "stringent." Further, any reviews that allegedly were relied upon by the Insurance Defendants were so antiquated that reliance thereon cannot justifiably serve as any bases for: (1) continued placing of the purported coverages by the Insurance Defendants; and (2) continued distribution of the Safety and Security Letters to depositors or potential depositors of SIB in knowing perpetuation of the SIB scheme.

40.     Baranoucky, Willis of Colorado, and Willis Group sent out their letters from an office in Colorado. By sending out these letters, they engaged in deceptive practices as part of their business, vocation, and occupation. The letters impacted the public as customers of Baranoucky, Willis of Colorado, and Willis Group's goods and services, namely financial products and Stanford CDs backed by their insurance products.

*Professional Duty*

41.     Professionals such as the Defendants owe a duty to non-clients who could be harmed by their actions and/or omissions. All the Defendants were working as professionals when they sent Safety and Security Letters to the Plaintiffs or to financial advisors who the Defendants knew were

instructed to use the letters to mislead SIB depositors such as Plaintiffs, knowing that the Plaintiffs, and others, would rely on the representations contained therein when considering whether or not to purchase Stanford CDs. The letters gave false information about many things, most notably the type and extent of coverages available, the quality and existence of the risk management reviews, and the character of the business people at SIB. This information was given for the guidance of the Plaintiffs. The Defendants did not exercise reasonable care when they failed to establish the truth of their statements in these letters. The Plaintiffs relied upon the Defendants' misrepresentations when deciding to deposit money at SIB, and now have been injured therefrom. Further, Winter and Baranoucky were acting in the course and scope of their duties as employees at BMB, Willis of Colorado, and Willis Group when they made their misrepresentations that harmed the Plaintiffs while earning handsome commissions for their employers and themselves.

42.     Having represented to the Plaintiffs and other depositors by letters and SIB financial statements that certain insurance coverage would be in effect and having worked closely with SIB, the Insurance Defendants had a duty to place, effect, maintain, or renew insurance coverage that would protect the Plaintiffs' deposits. The Insurance Defendants failed to place, effect, maintain, or renew this coverage.

43.     The Insurance Defendants had a duty to service the insurance and risk management accounts at SIB for policies related to the Stanford CDs. The Insurance Defendants should have serviced their insurance and risk management accounts at SIB by advising SIB on appropriate risk management policies, by advising SIB on appropriate controls to retain the benefits of insurance coverage, and by monitoring SIB and assisting SIB in monitoring compliance with these policies. The Insurance Defendants did not undertake appropriate action to inform or advise the appropriate SIB personnel of their obligations under the policies or to facilitate communication between SIB and

its insurers. The Insurance Defendants failed to service their accounts with SIB by failing in their obligations to assist SIB in filing claims against its insurer related to the Stanford CDs.

*The Co-Trustee Defendants*

44.     Aleman Trust Company, the Aleman Firm, and Jaime Aleman (the "Co-Trustee Defendants") all played critical roles in the sale of Stanford CDs to the Plaintiffs. Aleman Trust Company served as co-trustee on many trusts, including those at issue in this lawsuit, for which Stanford Trust Company Limited d/b/a Stanford Fiduciary Investor Services and Stanford Trust Company, Inc. served as trustee. Plaintiff O. Rishmague was the settlor and primary beneficiary of the UCB Properties Trust and the Inversiones Misanisa Trust. Plaintiff M. Rishmague was an ultimate beneficiary of these trusts. While Aleman Trust Company was serving as co-trustee of these trusts, the Aleman Firm (whose partners appear to be the principals of Aleman Trust Company) continued to represent SIB and its affiliates, including Stanford Bank Panama. Thus, the Aleman Trust Company was taking on fiduciary duties to the settlor and beneficiary Plaintiffs which necessarily required it to cast the jaundiced eye and scowling mien of a fiduciary upon the clients of the Aleman Firm; this could not be done, and in fact, was not done. Jaime Aleman personally oversaw these series of acts and omissions, and in many cases, personally executed trust documents.

45.     By order of the United States District Court for the Northern District of Texas, Stanford Trust Company resigned or was removed as fiduciary for all "STC fiduciary accounts," "upon the appointment of a successor fiduciary."[1]   Other designated co-trustees such as Aleman, Cordero, Galindo & Lee Trust ("Aleman") are incapable of representing the interests of the trust and its beneficiaries.

---

[1] *Securities and Exchange Commission v. Stanford International Bank, et. al.*, No. 3:09-cv-00298 (N.D. Tex., Apr. 23, 2009)(order establishing, *inter alia*, the resignation of Stanford Trust Company as fiduciary).

   © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

46.     Aleman Trust Company owed fiduciary duties of loyalty and care to the trusts at issue in this lawsuit and their settlors and beneficiaries. Aleman Trust Company breached its duty of loyalty by working harder to maintain its profitable relationship with SIB and STC than to look after the interests of the trusts and their beneficiaries. Aleman Trust Company breached its duty of care by failing to make a reasonably prudent investigation of the affairs, assets, and liabilities of SIB, especially in light of the large amount of business it did with SIB. As co-trustee, Aleman Trust Company had an obligation to see that STC would not commit a serious breach of trust, and an obligation to compel STC to redress serious breaches of trust.

47.     Aleman Trust Company made profits through or arising out of the administration of the trust. The trusts suffered losses resulting from the trustee's failure to perform its obligations as trustee.

48.     Aleman Trust Company, the Aleman Firm, and Jaime Aleman were essential links in the chain that lead to the sale of Stanford CDs. These Co-Trustee Defendants made false representations of material fact and omitted to state facts necessary to make other statements not misleading under the circumstances in which they were made.

49.     Had the Co-Trustees not committed breaches of trust, the trusts at issue in this lawsuit would have accrued profits.

*Conditions Precedent*

50.     All conditions precedent have occurred and/or have been waived.

     © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

## VII. CAUSES OF ACTION

### A. Violations of the Texas Insurance Code

*Count 1 – Misrepresenting the benefits of insurance policies – TEX. INS. CODE § 541.051(1).*

51.     The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 50.

52.     The Insurance Defendants committed unfair or deceptive acts or practices in the business of insurance when the Insurance Defendants made, issued, and circulated statements misrepresenting the benefits or advantages promised by an insurance policy. In the alternative, the Insurance Defendants caused such statements to be made, issued or circulated.

53.     The Insurance Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs.

54.     The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

55.     The Insurance Defendants knowingly committed the complained of acts.

56.     The Insurance Defendants are liable to the Plaintiffs for treble damages.

*Count 2 – Misrepresenting the name or title of insurance policies – TEX. INS. CODE § 541.051(4).*

57.     The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 56.

58.     The Insurance Defendants committed an unfair or deceptive act or practice in the business of insurance when the Insurance Defendants used a name or title of a policy or class of policies that misrepresented the true nature of the policy or class of policies.

59.     The Insurance Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs.

60.     The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

61.     The Insurance Defendants knowingly committed the complained of acts.

62.     The Insurance Defendants are liable to the Plaintiffs for treble damages.

**Count 3 – False information and advertising – TEX. INS. CODE § 541.052.**

63.     The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 62.

64.     The Insurance Defendants committed an unfair or deceptive act or practice in the business of insurance when the Insurance Defendants made, published, disseminated, circulated, and placed before the public certain advertisements, announcements, and statements. These advertisements, announcements, and statements contained untrue, deceptive and misleading assertions, representations and statements regarding the business of insurance and regarding a person in the conduct of the person's insurance business.  In the alternative, the Insurance Defendants caused such statements to be published, disseminated, circulated, and placed before the public.

65.     The Insurance Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs.

66.     The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

67.     The Insurance Defendants knowingly committed the complained of acts.

68.     The Insurance Defendants are liable to the Plaintiffs for treble damages.

**Count 4 – Misrepresentation of a policy of insurance – TEX. INS. CODE § 541.061.**

69.     The Plaintiffs reallege and the allegations of paragraphs 1 – 68.

70.     The Insurance Defendants committed an unfair or deceptive act or practice in the business of insurance by misrepresenting insurance policies when the Insurance Defendants made untrue statements of material fact, failed to state material facts necessary to make other statements not misleading considering the circumstances under which the statements were made, and making

statements in a manner that would mislead a reasonably prudent person to a false conclusion of material fact.

71.     The Insurance Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs.

72.     The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

73.     The Insurance Defendants knowingly committed the complained of acts.

74.     The Insurance Defendants are liable to the Plaintiffs for treble damages.

**B.  Colorado Consumer Protection Act**

***Count 5 –Violation of the Colorado Consumer Protection Act – COL. REV. STAT. 6-1-101, et seq.***

75.     The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 74.

76.     Amy Baranoucky, Willis of Colorado, and Willis Group engaged in deceptive trade practices.

77.     These practices occurred in the course of Baranoucky, Willis of Colorado, and Willis Groups' business, vocation, or occupation.

78.     These practices significantly impacted the public as actual or potential customers of Baranoucky, Willis of Colorado, and Willis Groups' goods, services, or property.

79.     The Plaintiffs have suffered injury in fact to their legally protected interests.

80.     Baranoucky, Willis of Colorado, and Willis Groups' deceptive practices caused the Plaintiffs' injuries.  These Defendants' acts and omissions were links in a chain that lead the to Plaintiffs' injuries.  There was a sufficient causal nexus between the Defendants' acts and omissions and the Plaintiffs' injuries despite the intervening acts of others.

81.     Baranoucky, Willis of Colorado, and Willis Group are liable to the Plaintiffs for their damages in the amount of $9,273,773.00.

82.     Baranoucky, Willis of Colorado, and Willis Group are liable to the Plaintiffs for treble damages.

## C. Common Law Claims

### Count 6 – Negligent Misrepresentation.

83.     The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 82.

84.     The Insurance Defendants made representations to the Plaintiffs in the course of the Insurance Defendants' business or in one or more transactions in which the Defendants had an interest.   The Insurance Defendants made statements to the Plaintiffs regarding SIB and Stanford CDs.  The Insurance Defendants either intended for the Plaintiffs to benefit from this information, or the Insurance Defendants knew or reasonably should have known that the Plaintiffs would receive the information.

85.     The Insurance Defendants supplied false information for the guidance of others.

86.     The Insurance Defendants did not exercise reasonable care or competence in obtaining or communicating the information.

87.     The Plaintiffs justifiably relied on the representations.

88.     The Insurance Defendants' negligent misrepresentations proximately caused the Plaintiffs' injuries.

89.     The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

90.     Defendants BMB, Willis of Colorado, and Willis Group are vicariously liable for all negligent misrepresentations made by their employees, Defendants Winter and Baranoucky.

       © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

***Count 7 – Negligent Procurement and Negligent Omission.***

91.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 90.

92.    The Insurance Defendants undertook to procure insurance policies for SIB, including third-party policies of insurance for the benefit of the Plaintiffs.

93.    The Insurance Defendants had a duty to maintain or renew insurance for SIB, including third-party policies of insurance for the benefit of the Plaintiffs.

94.    The Insurance Defendants did not exercise reasonable care, competence, or diligence in procuring the policies, or the Insurance Defendants did not exercise reasonable care, competence, or diligence in renewing and maintaining those policies.

95.    The Plaintiffs justifiably relied on the Insurance Defendants' representations that appropriate insurance policies had been procured or that such policies had been renewed or maintained.

96.    The Insurance Defendants' failure to use reasonable care, competence, or diligence in procuring third-party policies proximately caused the Plaintiffs' injuries.  In the alternative, the Insurance Defendants' failure to use reasonable care, competence, or diligence in renewing or maintaining third-party policies proximately caused the Plaintiffs' injuries.

97.    The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

***Count 8 – Failure to service policies.***

98.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 97.

99.    The Insurance Defendants had an obligation to service the insurance policies held by its customer SIB.

100.    The Insurance Defendants failed to service those policies.

101.    The Insurance Defendants' failure to service those policies caused the Plaintiffs to suffer losses.

102.    The Insurance Defendants are liable to the Plaintiffs for their losses and damages in the amount of $9,273,773.00.

***Count 9 – Fraud by Nondisclosure.***

103.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 102.

104.    All the Defendants concealed certain facts from the Plaintiffs, or failed to disclose certain facts to the Plaintiffs.  The Insurance Defendants concealed facts or failed to disclose facts relating to the policies of insurance.  All other Defendants concealed facts or failed to disclose facts related to their knowledge of the financial condition and practices of SIB.

105.    The Defendants had a duty to disclose the concealed or non-disclosed facts to the Plaintiffs.

106.    The concealed or non-disclosed facts were material.

107.    The Defendants knew that the Plaintiffs were ignorant of these facts, and that the Plaintiffs did not have an equal opportunity to discover these facts.

108.    The Defendants were deliberately silent when they had a duty to speak.

109.    By failing to disclose these facts, the Defendants intended to induce the Plaintiffs to take some action or to refrain from acting.

110.    The Plaintiffs relied on the Defendants' non-disclosure or concealment.

111.    The Plaintiffs were injured as a result of acting without knowledge of the undisclosed facts.

    © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

112.    The Defendants' non-disclosure or concealment caused the Plaintiffs' direct damages. The Defendants' non-disclosure or concealment proximately caused the Plaintiffs' consequential damages.

113.    The Defendants are liable to the Plaintiffs for direct and consequential damages for the Plaintiffs' injuries in the amount of $9,273,773.00.

## D.  Claims against Trustees

### Count 14 – Return of Profits Made by Trustee.

114.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 113.

115.    The Co-Trustee Defendants served as trustees of the trusts settled by the Plaintiffs.

116.    The Co-Trustee Defendants realized profits through administration of the trusts or arising out of administration of the trusts.

117.    The Co-Trustee Defendants are liable to the trusts settled by the Plaintiffs for the profits made through administration of the trusts or arising out of administration of the trusts.

### Count 15 – Losses From Trustee's Failure to Perform Fiduciary Duties.

118.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 117.

119.    The Co-Trustee Defendants served as trustees of the trusts at issue in this case.

120.    The Co-Trustee Defendants breached their fiduciary duty of loyalty and duty of care to the Plaintiffs as settlors or beneficiaries of such trusts.  These breaches of fiduciary duties were the proximate cause of damage to the trust estates.

121.    These trusts lost value as a result of these breaches.  Had the Co-Trustee Defendants not breached their fiduciary duties, profits would have accrued to the trusts.

   © 2011 Pulman, Cappuccio, Pullen & Benson, LLP

122.     The Co-Trustee Defendants are liable to the trusts settled by the Plaintiffs and their beneficiaries for the losses in value to the trust estate resulting from the breach of trust and for the profits that would have accrued to the trust estate had their been no breach of trust.

123.     The settlor and/or beneficiary Plaintiffs are the proper persons to bring these claims against the Co-Trustee Defendants for losses to the trust estates. The Defendants are liable to the Plaintiffs for damages in the amount of $9,237,773.

***Count 16 – Appointment of Successor Trustee.***

124.     The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 123.

125.     Aleman, Galindo, Cordero & Lee (BVI) Trust is the trustee of the trusts at issue in this lawsuit.

126.     The trustee has breached duties owed to the settlor and beneficiary Plaintiffs of such trusts.

127.     The settlor and beneficiary Plaintiffs, parties in interest to the trust, seek removal of the trustee and appointment of successor trustees.

## VIII. JURY DEMAND

128.     Plaintiffs hereby demand trial by jury. Payment of the required Jury Fee was tendered to the Court simultaneously with the filing of Plaintiffs' Original Petition.

## IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs pray that this Court find the Defendants liable to them for the Causes of Action stated hereinabove, and award them:

    a.  damages in the amount of $9,273,773.00;

    b.  special damages in the amount of $9,273,773.00;

    c.  consequential damages in the amount of $9,273,773.00;

     © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

d.  treble damages in the amount of $27,831,319.00;

e.  attorneys' fees;

f.  costs of court;

g.  prejudgment and post judgment interest;

h.  removal of trustees and appointment of successor trustees; and

i.  such other and further relief, both general and special, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

**PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Telecopier

By:  _____
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Eric A. Pullen
Texas State Bar No. 24007881
epullen@pulmanlaw.com
David Lopez
Texas State Bar No. 12562975
dlopez@pulmanlaw.com
Lance Hunter "Luke" Beshara
Texas State Bar No. 24045492
lbeshara@pulmanlaw.com
Alexander D. Burch
Texas State Bar No. 24073975
aburch@pulmanlaw.com

**ATTORNEYS FOR PLAINTIFFS**

 © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP







**BEXAR COUNTY COURTHOUSE**
**100 DOLOROSA**
**SAN ANTONIO TEXAS 78205**

# REQUEST FOR PROCESS

Cause No. 2011CI-02585

**FEE PAID**

Style: Rishmague v. Winter, et al.          Court: 225th Judicial District

Date: March 9, 2011

Request the following process:

■ Citation   □ Notice   □ Precept   □ Temporary Restraining Order

□ Subpoena   □ Subpoena *Duces Tecum* (Describe Duces Tecum on Reverse)   □ Other (Describe)

| Information for subpoena: | Date: | Time: | Court: |
|---|---|---|---|

Parties to be served (type or print):

1. Willis Group Holdings, Ltd.

Address: _____

                                    Type* *PRIVATE PROCESS*

2. ~~Bowen, Miclette & Britt, Inc.~~

Address: _____

                                    Type* ~~Private Process~~

3. Aleman, Galindo, Cordero & Lee Trust (BVI) Limited

Address: _____

                                    Type* Private Process

4. Aleman, Galindo, Cordero & Lee

Address: _____

                                    Type* Private Process *(for service on TX Secretary of State)*

5. Jaime Aleman

Address: _____

                                    Type* Private Process (for service on TX Secretary of State)

*Type: Sheriff; Constable Precinct _____; Private Process Server; Certified Mail; Registered Mail; Out of County; Out of State; Secretary of State; Commissioner of Insurance.

Name and address of attorney: Randall A. Pulman; Pulman, Cappuccio, Pullen & Benson, LLP; 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; (210) 222-9494

Attorney's Bar No. 16393250

Attorney for: ■ Plaintiff   □ Defendant   □ Other



2011CI02585 -P00006





**BEXAR COUNTY COURTHOUSE**
**100 DOLOROSA**
**SAN ANTONIO TEXAS 78205**

# REQUEST FOR PROCESS

③

Cause No. 2011CI-02585

**FEE PAID**

Style: Rishmague v. Winter, et al.

Court: 225th Judicial District

Date: March 9, 2011

11 MAR 10   PM 12: 31   FILED DISTRICT CLERK DEPUTY

**Request the following process:**

| | | | |
|---|---|---|---|
| ■ Citation | ☐ Notice | ☐ Precept | ☐ Temporary Restraining Order |
| ☐ Subpoena | ☐ Subpoena *Duces Tecum* *(Describe Duces Tecum on Reverse)* | | ☐ Other *(Describe)* |

| Information for subpoena: | Date: | Time: | Court: | |
|---|---|---|---|---|

**Parties to be served (type or print):**

1. Robert S. Winter

Address: _____

Type* Private Process

2. Bowen, Miclette & Britt, Inc.

Address: _____

Type* Private Process

3. Amy S. Baranoucky

Address: _____

Type* Private Process (for service on TX Secretary of State)

4. Willis of Texas, Inc.

Address: _____

Type* Private Process

5. Willis of Colorado, Inc.

Address: _____

Type* Private Process

*Type: Sheriff; Constable Precinct _____; Private Process Server; Certified Mail; Registered Mail; Out of County; Out of State; Secretary of State; Commissioner of Insurance.

**Name and address of attorney:** Randall A. Pulman; Pulman, Cappuccio, Pullen & Benson, LLP;
2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; (210) 222-9494

Attorney's Bar No. 16393250

**Attorney for:** ■ Plaintiff  ☐ Defendant  ☐ Other _____

PRIVATE PROCESS

"The State of Texas"                    NO.   2011-CI-02585

2011CI02585 -S00001

MIGUEL RISHMAGUE ET AL
Plaintiff
VS.

ROBERT S WINTER ET AL
Defendant
( Note: Attached Document May Contain Additional Litigants. )

**NOTICE**

Citation Directed to: WILLIS GROUP HOLDINGS LTD
BY SERVING SECRETARY OF STATE

IN THE DISTRICT COURT

225th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the _9th_ day of _March_, _2011_.
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS _10th_ DAY OF _March_ A.D., _2011_.

FIRST AMENDED PETITION

*Bill Blanchard*

*3/14/11*

RANDALL A PULMAN
Attorney/PLAINTIFF
address 2161 NW MILITARY HWY 400
SAN ANTONIO, TX 78213-1878

**DONNA KAY MCKINNEY**
District Clerk of Bexar County, Texas

By: *Stephanie R. Holman*                    Deputy
STEPHANIE HOLMAN

---

## OFFICER'S RETURN

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
Badge/PPS # _____
_____ County, Texas

By _____

The State of Texas

**NON - PEACE OFFICER VERIFICATION**

VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____

_____
NOTARY PUBLIC, STATE OF TEXAS

**FILE COPY**
(DK002)

PRIVATE PROCESS

"The State of Texas"          NO. __2011-CI-02585__

2011CI02585 -S00003

MIGUEL RISHMAGUE ET AL
Plaintiff
VS.

ROBERT S WINTER ET AL
Defendant
( Note: Attached Document May Contain Additional Litigants. )

**NOTICE**

IN THE DISTRICT COURT

225th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

Citation Directed to: ALEMAN GALINDO CORDERO AND LEE
BY SERVING SECRETARY OF STATE

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the __9th__ day of __March__, __2011__.
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS __10th__ DAY OF __March__ A.D., __2011__.

FIRST AMENDED PETITION

*B Blanchard*

*3/16/11*

RANDALL A PULMAN
Attorney/PLAINTIFF
address 2161 NW MILITARY HWY 400
SAN ANTONIO, TX 78213-1878

DONNA KAY MCKINNEY
District Clerk of Bexar County, Texas

By _____, Deputy
STEPHANIE HOLMAN

---

**OFFICER'S RETURN**

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
_____ Badge/PPS # _____

_____ County, Texas

By _____

The State of Texas

**NON - PEACE OFFICER VERIFICATION**

VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____

_____
NOTARY PUBLIC, STATE OF TEXAS

FILE COPY
(DK002)

PRIVATE PROCESS

"The State of Texas"             NO.   2011-CI-02585

2011CI02585 -S00004

MIGUEL RISHMAGUE ET AL
Plaintiff
Vs.

ROBERT S WINTER ET AL
Defendant
( Note: Attached Document May Contain Additional Litigants. )     **NOTICE**

**Citation** Directed to:  JAIME ALEMAN
                           BY SERVING SECRETARY OF STATE

IN THE DISTRICT COURT

225th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

"You have been sued. You may employ an attorney. If you or your attorney do not
file a written answer with the clerk who issued this citation by 10:00 a.m. on the
Monday next following the expiration of twenty days after you were served this
citation and petition, a default judgment may be taken against you." Said petition
was filed on the  9th  day of  March         ,  2011  .
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS  10th  DAY OF  March
A.D.,  2011 .

FIRST AMENDED PETITION

*To Blanchard*

*7/16/11*

RANDALL A PULMAN
Attorney/PLAINTIFF
address  2161 NW MILITARY HWY 400
         SAN ANTONIO, TX 78213-1878

DONNA KAY MCKINNEY
District Clerk of Bexar County, Texas

By: _____ Deputy
    STEPHANIE HOLMAN

---

### OFFICER'S RETURN

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's
petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
            Badge/PPS # _____

_____
                                          County, Texas
By _____

The State of Texas

NON - PEACE OFFICER VERIFICATION
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____

NOTARY PUBLIC, STATE OF TEXAS

FILE COPY
(DK002)

PRIVATE PROCESS

"The State of Texas"                    NO. __2011-CI-02585__

2011CI02585 -S00007

MIGUEL RISHMAGUE ET AL
Plaintiff
vs.

ROBERT S WINTER ET AL
Defendant
( Note: Attached Document May Contain Additional Litigants. )    **NOTICE**

**Citation** Directed to:  AMY S BARANOUCKY
                           BY SERVING SECRETARY OF STATE

IN THE DISTRICT COURT

225th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the __9th__ day of __March__ , __2011__ .
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS __10th__ DAY OF __March__ A.D., __2011__ .

FIRST AMENDED PETITION

RANDALL A PULMAN
Attorney/PLAINTIFF
address  2161 NW MILITARY HWY 400
         SAN ANTONIO, TX 78213-1878

**DONNA KAY MCKINNEY**
District Clerk of Bexar County, Texas

By: _____ Deputy
    STEPHANIE HOLMAN

---

**OFFICER'S RETURN**

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's
petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
         Badge/PPS #_____        _____
                                      _____ County, Texas
                                      By _____
The State of Texas

NON - PEACE OFFICER VERIFICATION
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____

_____
NOTARY PUBLIC, STATE OF TEXAS

**FILE COPY**
(DK002)

PRIVATE PROCESS

"The State of Texas"          NO.   2011-CI-02585

2011CI02585 -S00002

MIGUEL RISHMAGUE ET AL
Plaintiff
Vs.

ROBERT S WINTER ET AL
Defendant
( Note: Attached Document May Contain Additional Litigants. )          **NOTICE**

IN THE DISTRICT COURT

225th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

**Citation** Directed to:  ALEMAN GALINDO CORDERO & LEE TRUST BVI LIMITED

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the  9th  day of  March           ,  2011  .
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS  10th  DAY OF  March
A.D., 2011 .

FIRST AMENDED PETITION

*Blanded*
*3/16/11*

RANDALL A PULMAN
Attorney/PLAINTIFF
address 2161 NW MILITARY HWY 400
SAN ANTONIO, TX 78213-1878

**DONNA KAY MCKINNEY**
**District Clerk of Bexar County, Texas**

By: *Stephanie R Holman* Deputy
     STEPHANIE HOLMAN

---

## OFFICER'S RETURN

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's
petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
          Badge/PPS #_____

_____ County, Texas
By _____

The State of Texas

NON - PEACE OFFICER VERIFICATION
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____

_____
NOTARY PUBLIC, STATE OF TEXAS

**FILE COPY**
(DK002)

PRIVATE PROCESS

"The State of Texas"  NO. 2011-CI-02585

2011CI02585 -S00005

MIGUEL RISHMAGUE ET AL
**Plaintiff**
**vs.**

ROBERT S WINTER ET AL
**Defendant**
( Note: Attached Document May Contain Additional Litigants. )   **NOTICE**

**Citation** Directed to:  ROBERT S WINTER

IN THE DISTRICT COURT

225th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the 9th day of March, 2011.
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS 10th DAY OF March A.D., 2011.

FIRST AMENDED PETITION

RANDALL A PULMAN
Attorney/PLAINTIFF
address 2161 NW MILITARY HWY 400
SAN ANTONIO, TX 78213-1878

DONNA KAY MCKINNEY
District Clerk of Bexar County, Texas

By:_____ Deputy
STEPHANIE HOLMAN

---

**OFFICER'S RETURN**

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
Badge/PPS #_____

_____ County, Texas
By _____

The State of Texas

NON - PEACE OFFICER VERIFICATION
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____



NOTARY PUBLIC, STATE OF TEXAS

**FILE COPY**
(DK002)

PRIVATE PROCESS

"The State of Texas"          NO.  2011-CI-02585

MIGUEL RISHMAGUE ET AL
**Plaintiff**
vs.

ROBERT S WINTER ET AL
**Defendant**
( Note: Attached Document May Contain Additional Litigants. )     **NOTICE**

**Citation** Directed to:  BOWEN MICLETTE & BRITT INC

2011CI02585 -S00006

IN THE DISTRICT COURT

225th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the  9th  day of  March        ,  2011 .
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS  10th  DAY OF  March
A.D., 2011 .

FIRST AMENDED PETITION

*M Blanchard*
*3/10/11*

RANDALL A PULMAN
**Attorney/PLAINTIFF**
**address**  2161 NW MILITARY HWY 400
         SAN ANTONIO, TX 78213-1878

**DONNA KAY MCKINNEY**
**District Clerk of Bexar County, Texas**

*Stephanie R Holman*
**By:_____** Deputy
         STEPHANIE HOLMAN

---

**OFFICER'S RETURN**

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's
petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
        Badge/PPS #_____          _____
                                       _____ County, Texas
                                       **By** _____
The State of Texas
                          **NON - PEACE OFFICER VERIFICATION**
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____

NOTARY PUBLIC, STATE OF TEXAS

**FILE COPY**
(DK002)

PRIVATE PROCESS

"The State of Texas"          NO.  2011-CI-02585

2011CI02585 -S00008

MIGUEL RISHMAGUE ET AL
**Plaintiff**
VS.

ROBERT S WINTER ET AL
**Defendant**
( Note: Attached Document May Contain Additional Litigants. )   **NOTICE**

**IN THE DISTRICT COURT**

**225th JUDICIAL DISTRICT**

**BEXAR COUNTY, TEXAS**

**Citation** Directed to:  WILLIS OF COLORADO INC

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the  9th  day of  March           ,  2011 .
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS  10th  DAY OF  March         A.D.,  2011 .

FIRST AMENDED PETITION

_To Blanchard_

_, 3/16/11_

RANDALL A PULMAN
Attorney/PLAINTIFF
address 2161 NW MILITARY HWY 400
          SAN ANTONIO, TX 78213-1878

**DONNA KAY MCKINNEY**
District Clerk of Bexar County, Texas

By:_____ Deputy
      **STEPHANIE HOLMAN**

---

**OFFICER'S RETURN**

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
          Badge/PPS #_____          _____
                                        _____ County, Texas
                                        By _____

The State of Texas

**NON - PEACE OFFICER VERIFICATION**
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____

**NOTARY PUBLIC, STATE OF TEXAS**

**FILE COPY**
(DK002)

PRIVATE PROCESS

"The State of Texas"                NO.   2011-CI-02585

2011CI02585 -S00009

MIGUEL RISHMAGUE ET AL
Plaintiff
vs.

ROBERT S WINTER ET AL
Defendant
( Note: Attached Document May Contain Additional Litigants. )     **NOTICE**

Citation Directed to:  WILLIS OF TEXAS INC

IN THE DISTRICT COURT

225th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the  9th  day of  March       ,  2011  .
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS  10th  DAY OF  March
A.D., 2011 .

FIRST AMENDED PETITION

*B Blanchard*

*3/16/17*

RANDALL A PULMAN
Attorney/PLAINTIFF
address  2161 NW MILITARY HWY 400
SAN ANTONIO, TX 78213-1878

**DONNA KAY MCKINNEY**
District Clerk of Bexar County, Texas

*Stephanie R Holman*

By:_____ Deputy
STEPHANIE HOLMAN

---

### OFFICER'S RETURN

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
          Badge/PPS #_____     _____
                                   _____ County, Texas
                                   By _____
The State of Texas

                    NON - PEACE OFFICER VERIFICATION
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____

                    _____
                    NOTARY PUBLIC, STATE OF TEXAS
                              **FILE COPY**
                                (DK002)

2011CI02585 -P00001
Filed
11 February 16 P7:14
Donna Kay McKinney
District Clerk
Bexar District
Accepted by:
Jennifer Contreras

CAUSE NO. 2011 CI 02585

| | | |
|---|---|---|
| MIGUEL RISHMAGUE AND ODDE JALIL RISHMAGUE R., INDIVIDUALLY AND AS REPRESENTATIVE FOR THE UCB PROPERTIES TRUST AND INVERSIONES MISANISA TRUST, | § § § § § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § § | |
| v. | § § | |
| ROBERT S. WINTER; BOWEN, MICLETTE & BRITT, INC. F/K/A BOWEN, MICLETTE, DESCANT & BRITT, INC.; AMY S. BARANOUCKY; WILLIS OF COLORADO, INC.; WILLIS OF TEXAS, INC.; WILLIS GROUP HOLDINGS, LTD.; JAIME ALEMAN; ALEMAN, GALINDO, CORDERO & LEE; AND ALEMAN, GALINDO, CORDERO & LEE TRUST (BVI) LIMITED, | § § § § § § § § § § | 225 JUDICIAL DISTRICT |
| DEFENDANTS | § § § | BEXAR COUNTY, TEXAS |

---

## PLAINTIFFS' ORIGINAL PETITION

---

TO THE HONORABLE JUDGE OF SAID COURT:

Now COMES Miguel Rishmague, and Odde Jalil Rishmague R., individually and on behalf of UCB Properties Trust and Inversiones Misanisa Trust, complaining of Robert S. Winter; Bowen, Miclette & Britt, Inc. f/k/a Bowen; Miclette, Descant & Britt, Inc.; Amy S. Baranoucky; Willis of Colorado, Inc.; Willis Group Holdings, Ltd.; Jaime Aleman; Aleman, Galindo, Cordero & Lee Trust; and Aleman, Galindo, Cordero & Lee Trust (BVI) Limited and would respectfully show unto the Court the following:

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

## I. Discovery Level

1.      The Plaintiffs intend for discovery to be conducted under Level 3 pursuant to TEX. R. CIV. P. 190.4.

## III. Parties

### A. Plaintiffs

2.      Plaintiff Miguel Rishmague ("M. Rishmague") is a citizen of the United States of America and resident of Florida.

3.      Plaintiff Odde Jalil Rishmague R. ("O. Rishmague") is a citizen of Chile.

### B. Defendants

#### (i) Insurance Defendants

4.      Defendant Robert S. Winter ("Winter") is an individual residing at 10015 Olympia, Houston, Harris County, Texas 77042.  Winter may be served with process by serving him at his usual place of abode, or wherever he may be found.

5.      Defendant Bowen, Miclette & Britt, Inc. ("BMB") is a corporation organized under the laws of Texas, with its principal office at 1111 North Loop West, Suite 400, Houston, Harris County, Texas 77008.  BMB may be served with process by servings its registered agent, CT Corporation System, at 350 North St. Paul Street, Dallas, Texas 75201.

6.      Defendant Amy S. Baranoucky ("Baranoucky") is an individual and, upon information and belief, a United States citizen, currently residing in 4295 Columbine Drive, Unit 8, Vail, Colorado 81657-4767.  Baranoucky may be served with process by serving the Secretary of State by certified mail, return receipt requested, pursuant to TEX. R. CIV. P. 106 and 108a, and forwarded to Baranoucky's residence.  This Court has jurisdiction over Ms. Baranoucky pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042.  Ms. Baranoucky

   © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

purposefully availed herself of Texas law by obtaining a license to sell insurance in Texas and

actually selling policies in Texas. Ms. Baranoucky also made numerous contacts with SIB's office

in Texas and sent Safety and Security letters directly to Texas residents and/or to SIB offices located

in Texas for dissemination to other SIB depositors or potential depositors including Plaintiffs.

Her contacts were purposeful, consistent, and ongoing. She sought benefit, advantage or profit from

these contacts because she sought to maintain her business relationships with SIB and provided

information to the Plaintiffs for her own pecuniary benefit.

7.      Defendant Willis of Texas, Inc. ("Willis of Texas") is a Texas corporation and may

be served with process by serving its registered agent, CT Corporation System at 350 North St. Paul

St., Ste. 2900, Dallas, Texas 75201-4234.

8.      Defendant Willis of Colorado, Inc. ("Willis of Colorado") is a corporation organized

the laws of Colorado. Willis of Colorado has engaged in business in the State of Texas, and

maintains a designated agent for service of process in Texas. Willis may be served with process by

servings its registered agent, CT Corporation System, at 350 North St. Paul Street, Dallas,

Texas 75201. This Court has jurisdiction over Willis of Colorado pursuant to the Texas Long-Arm

Statute, TEX. CIV. PRAC. & REM. CODE § 17.042.

9.      Defendant Willis Group Holdings, Ltd. ("Willis Group") is a corporation organized

under the laws of Bermuda, with its principal place of business at 51 Lime Street, London,

EC3M 7DQ, England, in the United Kingdom. Willis has engaged in business in the State of Texas,

but does not maintain a regular place of business or a designated agent for service of process in

Texas. Willis Group may be served with process by service on the Secretary of State.

Willis Group may also be served via the Hague Convention on the Service Abroad of Judicial and

Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

(1965).  Willis Group may be served by serving its its registered agent in Bermuda: Appleby, Canon's Court, 22 Victoria Street, Hamilton, Bermuda. This Court has jurisdiction over Willis Group pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042. Willis Group made numerous contacts, directly or indirectly through its agents, with SIB's office in Texas and sent letters, directly or throught its agents, to Texas residents and/or to SIB offices located in Texas for dissemination to other SIB depositors or potential depositors, including Plaintiffs. Its contacts were purposeful, consistent, and ongoing. It sought benefit, advantage or profit from these contacts because it sought to maintain its business relationships with SIB and provided information to the Plaintiffs for its own pecuniary benefit.

### (ii)  Co-Trustee Defendants

10.     Defendant Aleman, Galindo, Cordero & Lee Trust (BVI) Limited ("Aleman Trust Company") is a British Virgin Islands private trust company, or in the alternative, is an entity organized under the laws of the British Virgin Islands capable of bringing suit and being sued in its own name, with its principal place of business in the British Virgin Islands. This Court has jurisdiction over Aleman Trust Company pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042. Aleman Trust Company is subject to personal jurisdiction in this Court to hear a suit related to its liability for losses suffered by these Plaintiffs. Aleman Trust Company's specific contacts with SIB and STC in Texas and its service as Co-Trustee of the trusts at issue in this lawsuit was purposeful, consistent and ongoing, and it sought benefit, advantage and profit when it was paid fees to serve as Co-Trustee of such trust. The situs of administration of the trust at issue in this lawsuit and of which Aleman Trust Company was Co-Trustee was in Texas and was largely managed from Texas in coordination with the Aleman Trust Company. Aleman Trust Company contracted with one or more Texas residents to perform part of a contract in Texas when

it took on the duty to make reasonable inquiry into the affairs of Stanford International Bank. By breaching those trust contracts, Aleman Trust Company conducted business in Texas. Aleman Trust Company has engaged in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in Texas. Aleman Trust Company may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, which was signed by the United Kingdom and made applicable by that country to the British Virgin Islands. Aleman Trust Company may be served by any method authorized under the Hague Convention, the laws of Texas, and the laws of the British Virgin Islands, including service upon the appropriate officer of Aleman Trust Company at its principal place of business at 3rd Floor, Geneva Place, 333 Waterfront Drive, P. O. Box 71 Road Town, Tortola, British Virgin Islands. Service upon Aleman Trust Company may also be effected by service upon Gabriella Conte, Registered Agent for Aleman Trust Co., at P. O. Box 3175, Road Town, Tortola, British Virgin Islands. Service upon Aleman Trust Company may also be effected by service upon Jaime Aleman wherever he may be found.

11. Defendant Aleman, Galindo, Cordero & Lee ("Aleman Firm") is an entity or association whose principle place of business is in the Republic of Panama. Upon information and belief, the Aleman Firm is a general partnership. This Court has jurisdiction over the Aleman Firm pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042. The Aleman Firm made numerous contacts with Texas residents and/or businesses. Its contacts were purposeful, consistent, and ongoing. The firm sought benefit, advantage or profit from these contacts because it obtained pecuniary benefit from serving as trustee for the trusts at issue in this lawsuit. The firm also worked with others to commit torts in Texas in whole or in part. The Aleman Firm has engaged in business in the State of Texas, but does not maintain a regular place of business in Texas or a

©2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

designated agent for service of process in Texas. Therefore, under TEX. CIV. PRAC. & REM. CODE § 17.044, substituted service should be made on the Aleman Firm by serving the Secretary of State, Statutory Documents Section, Citations Unit, P. O. Box 12079, Austin, Texas 78711-2079, and forwarded to the Aleman Firm's principal place of business at 2nd Floor, East 53rd Street, Ur. Marbella, P. O. Box 0819-09132, Panama City, Republic of Panama. Service on the Aleman Firm can be effected pursuant to methods permitted by the Inter-American Convention on Letters Rogatory and Additional Protocol, or by any other method permitted under the laws of the State of Texas and the Republic of Panama. The Aleman Firm may also be served by effecting service on Jaime Aleman in the manner described below. Aleman is a general partner, officer, manager, agent, or other appropriate person to receive service on behalf of the Aleman Firm.

12.     Defendant Jaime Aleman is an individual residing in Panama City, Panama. Mr. Aleman is licensed to practice law in the United States, and is a member of the bar of the District of Columbia. This Court has jurisdiction over Aleman pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.042. Aleman made numerous contacts with Plaintiffs in and/or from Texas. His contacts were purposeful, consistent, and ongoing. He sought benefit, advantage or profit from these contacts because he obtained pecuniary benefit from the service of his associated entities, Aleman Trust and the Aleman Firm, who served as trustee for trusts at issue in this lawsuit. He also worked with others to commit torts in Texas in whole or in part. Aleman has engaged in business in the State of Texas, but does not maintain a regular place of business in Texas or a designated agent for service of process in Texas. Therefore, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044, substituted service should be made on Aleman by serving the Secretary of State, Statutory Documents Section, Citations Unit, P. O. Box 12079, Austin, Texas 78711-2079, and forwarded to Aleman's usual place of business at 2nd Floor, East 53rd Street, Ur. Marbella,

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

P. O. Box 0819-09132, Panama City, Republic of Panama.  Service on Aleman can be effected

pursuant to methods permitted by the Inter-American Convention on Letters Rogatory and

Additional Protocol, or by any other method permitted under the laws of the State of Texas and the

Republic of Panama.  Service upon Aleman may also be effected by serving him by mail at the

address he maintains with the District of Columbia Bar Association at P. O. Box 0819-09132,

Panama City, Panama.

## IV. JURISDICTION & VENUE

13.     This Court has jurisdiction to hear this case because the Plaintiffs request damages

and remedies in excess of the minimum jurisdictional limits of this Court.  In addtion, this Court has

original and exclusive jurisdiction pursuant to TEX. PROP. CODE § 115.001 because this is an action

against a trustee and/or concerning trusts.  Further, the claims asserted herein and parties to this

action do not give rise to federal court jurisdiction and thus preclude removal to the federal courts.

14.     Venue is proper in Bexar County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE

§ 15.002(a)(1) because all or a substantial part of the acts or omissions giving rise to Plaintiffs'

claims occurred in Bexar County, Texas.

15.     Pleading in the alternative, to the extent necessary, venue for this suit is proper in

Bexar County, Texas pursuant to TEX. PROP. CODE § 115.002.  The Trustee of the trust at issue

herein was Stanford Trust Company or Stanford Trust Company Limited d/b/a Stanford Fiduciary

Investor Services, or some other affiliated entity, which were corporate trustees.  Stanford Fiduciary

Investor Services maintained an office in Bexar County, Texas.  This Bexar County, Texas office

was the situs of administration of the trusts at issue in this lawsuit, and thus Bexar County, Texas

is the proper place of venue for this suit pursuant to TEX. PROP. CODE § 115.001.

     © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

16.     Pleading in the alternative, to the extent necessary, venue is proper in Bexar County because Willis of Texas operates its business in Bexar County, Texas.

## V. INTRODUCTION

17.     Sir R. Allen Stanford built Stanford International Bank, Ltd. ("SIB") into an $8 billion dollar enterprise that attracted 30,000 investors from the United States, Mexico, Venezuela, and dozens of other countries. On February 17, 2009, the Securities and Exchange Commission filed a lawsuit in the United States District Court for the Northern District of Texas that shut down SIB once and for all, calling it "a massive Ponzi scheme." Many unanswered questions remain about how Stanford, a former gym operator from Mexia, Texas, came to operate a multi-faceted financial empire from the Caribbean island nation of Antigua and Barbuda, but the one thing that can be said for sure is that, much like a turtle sitting on top of a fence post, he did not get there all by himself.

18.     SIB posed as a "safe" bank which, according to the Insurance Defendants' continuous and repeated assurances, was backed by well-placed insurance policies and/or coverages from reputable carriers conditioned on "stringent risk management reviews." These repeated irresponsible and wholly misleading statements were made to current and potential depositors, including Plaintiffs, by the Insurance Defendants on behalf of SIB without proper disclosure, with total disregard for their intentionally misleading nature, and for the specific purpose of advancing the interests of SIB and themselves at the expense of innocent depositors.

19.     Robert Winter, Bowen, Miclette & Britt, Inc., Amy S. Baranoucky, the Willis Group, and Willis of Colorado (collectively the "Insurance Defendants"), held themselves out as "Insurance and Risk Managers" to the depositors as the persons and/or entities responsible for performing those functions for SIB. For years, the Insurance Defendants consented, allowed, and/or

encouraged SIB to list them on SIB's publicly distributed Financial Statements as "Insurance & Risk

Managers" for SIB despite such financial statements being patently false and serving only as yet

another misleading marketing tool for SIB. *See, e.g.,* Exhibit "A" at p. 19, 2007 SIB Annual Report.

For example, the following is an excerpt of SIB's 2007 annual report regarding "LIQUIDITY RISK":

| AT 31 DECEMBER 2007 | ASSETS UP TO 1 MONTH | 1-3 MONTHS | 3-6 MONTHS | 6-12 MONTHS | OVER 12 MONTHS | NON-INTEREST-BEARING | TOTAL |
|---|---|---|---|---|---|---|---|
| Cash and Balances with Other Banks | $ 627,322,483 | $ 0 | $ 0 | $ 0 | $ 0 | $ 500,000 | $ 627,822,483 |
| Financial Assets at Fair Value | 5,636,585,438 | 197,098,866 | 25,289,803 | 80,451,575 | 408,105,892 | 0 | 6,347,631,574 |
| Loans and Advances to Clients | 69,732,601 | 0 | 0 | 0 | 0 | 0 | 69,732,601 |
| Property and Equipment | 0 | 0 | 0 | 0 | 0 | 6,910,778 | 6,910,778 |
| Other Assets | 0 | 0 | 0 | 0 | 0 | 5,785,277 | 5,785,277 |
| TOTAL ASSETS | $ 6,333,740,522 | $ 197,098,866 | $ 25,289,803 | $ 80,451,575 | $ 408,105,892 | $ 13,196,055 | $ 7,057,882,713 |
| **LIABILITIES** | | | | | | | |
| Deposits from Clients | 480,040,692 | 530,340,338 | 716,474,596 | 1,107,864,300 | 3,855,244,377 | 0 | 6,689,964,303 |
| Other Liabilities | 0 | 0 | 0 | 0 | 0 | 12,996,649 | 12,996,649 |
| TOTAL LIABILITIES | $ 480,040,692 | $ 530,340,338 | $ 716,474,596 | $ 1,107,864,300 | $ 3,855,244,377 | $ 12,996,649 | $ 6,702,960,952 |
| NET LIQUIDITY GAP | $ 5,853,699,830 | $ (333,241,472) | $ (691,184,793) | $ (1,027,412,725) | $ (3,447,138,465) | $ 199,406 | $ 354,921,761 |
| **AT 31 DECEMBER 2006** | | | | | | | |
| Total Assets | $ 4,459,272,893 | $ 51,283,001 | $ 15,366,000 | $ 55,867,001 | $ 740,876,015 | $ 13,652,537 | $ 5,336,317,447 |
| Total Liabilities | $ 383,888,899 | $ 446,715,265 | $ 213,738,713 | $ 1,203,585,335 | $ 2,762,155,554 | $ 14,930,484 | $ 5,025,014,250 |
| NET LIQUIDITY GAP | $ 4,075,383,994 | $ (395,432,264) | $ (198,372,713) | $ (1,147,718,334) | $ (2,021,279,539) | $ (1,277,947) | $ 311,303,197 |

*Id.* at p.11. As indicated in the Liquidity Risk Statement above (issued in the final annual report

released by SIB before its house of cards began to unravel), SIB claimed it had over $6.3 billion in

"Financial Assets at Fair Value," of which over $5.6 billion were capable of liquidation

(convertible to an "on-demand" asset such as cash) within one month. Of course we now know this

statement was false and merely served as part of SIB's continued smoke and mirrors campaign to

lull depositors into believing their deposits were safe and secure in order to prevent withdrawals and

encourage more deposits into SIB's deepening funnel of deceit. The Insurance Defendants, by

allowing themselves to be represented as purported "Risk Managers," implied that they had

supported, reviewed, and/or validated the risks, including liquidity risk, within the annual reports.

 ©2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

To further validate the SIB scheme, the Insurance Defendants, through the SIB financial statements and through "Safety and Security Letters," declared SIB was covered by "Depository Insolvency," "Excess FDIC Insurance," and "Bankers Blanket Bond" insurance coverages. The SIB financial statements provide:

> The insurance coverage of the Bank includes Property and Casualty, Worldwide Package, Vehicle, Workers' Compensation and Travel Accident coverage. Financial coverage includes Banker's Blanket Bond, Director' and Officers' Liability, and Errors and Omissions Liability. The Bank also maintains Depository Insolvency coverage for its correspondent banks.
>
> The Bank's insurance program is independently reviewed. The latest review was performed by Stogniew & Associates, an independent risk management consultant. The primary objective of each review is to provide assurance that the risk management and internal controls currently implemented minimize the Bank's exposure to loss. The most recent assessment stated that the Bank had reasonable internal controls and risk management systems in place and found no material weaknesses in these areas.

Exhibit "A" at p.13, Note 2.6. SIB and the Insurance Defendants wanted the Plaintiffs to believe that the risk management reviews, internal controls, and insurance program were "reasonable," "minimize[d] the bank's exposure to loss," and were without "material weakness." To further particularize their participation in the SIB scheme, the Insurance Defendants personally sent "Safety & Security Letters" addressed to SIB depositors that, like the financial statements, were intended to lead the depositors to believe that there were insurance policies and/or coverages protecting the depositors' interests. Instead, what little insurance coverage existed was there to protect the bank's shareholder R. Allen Stanford, his assets, and his close friends and advisors, not SIB's depositors.

20.     The risk management reviews referred to in the Insurance Defendants' letters and in the SIB financial statements were presumably the same ones performed by Stogniew and Associates

   © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

that SIB described in its financial statements. *See, e.g.,* Exhibit "A" at Note 2.6, p. 13, 2007

SIB Financial Statement. Yet even a perfunctory review by the Insurance Defendants of the alleged

"stringent risk management review" performed by Stogniew & Associates in June of 2003 would

have revealed the following:

> **THE RISK SURVEY WAS NOT CONDUCTED FOR THE
> PURPOSE OF EXPRESSING AN OPINION ON STANFORD'S
> FINANCIAL STATEMENTS, INTERNAL CONTROL, RISK
> MANAGEMENT SYSTEMS OR OPERATING PROCEDURES,
> AND WAS LIMITED TO OBTAINING INFORMATION
> PERTINENT TO THE UNDERWRITING OF INSURANCE
> POLICIES PURCHASED BY STANFORD.**

First, the Stogniew Risk Survey was addressed to and only for the benefit of the "Underwriters of

Lloyd's." Furthermore, Stogniew's last reviews of the bank were conducted in 2003. Even if the

reviews had been adequate to back up SIB and the Insurance Defendants' claims, which they were

not, they were so out of date as to be worthless. In addition, the cover letter of the Risk Survey states

that the surveyor "did not independently test the effectiveness of the internal controls, risk

management systems or the accuracy of the financial reports." This can hardly serve as the

measuring stick by which to claim the review was "stringent." Accordingly, the publicly distributed

SIB financial statements and the Safety and Security Letters are littered with false and misleading

statements that have no justification other than to further the interests of SIB and the Insurance

Defendants at the expense of the SIB depositors and/or potential depositors. It is likely that

Defendant Winters and Defendant Baranoucky never even saw any Stogniew Risk Survey.

21.     The Insurance Defendants were the ones responsible for placing the insurance

coverages, and the Insurance Defendants represented to all of the SIB depositors

(including Plaintiffs) through the SIB financial statements and Safety and Security Letters that the

coverages had been placed. The Insurance Defendants were insurance professionals who provided

professional services to SIB and who are liable to the Plaintiffs under the Texas Insurance Code and Colorado Consumer Protection Act for the roles they played at SIB.   Each of the Insurance Defendants is liable to the Plaintiffs for the negligent misrepresentations they made about deposit insurance coverages at SIB. The Defendants are responsible for the Plaintiffs' lost deposits in the amount of $9,273,773.00.

22.    R. Allen Stanford set up a number of trust companies such as Stanford Trust Company ("STC") and Stanford Trust Company, Ltd. ("STC,L") doing business as Stanford Fiduciary Investor Services ("SFIS") (collectively the "Trust Companies") to serve as the trustee of trusts settled by some of the Plaintiffs and to further lure depositors into purchasing Stanford CDs. The Trust Companies worked with a co-trustee, Aleman, Cordero, Galindo & Lee Trust (BVI) Limited, and its leadership to promote the purchase of Stanford CDs.  The trustee companies and their employees also profited from their service as trustees and breached fiduciary duties they owed to the Plaintiffs. The Co-Trustee Defendants, and their principals and employees are liable to the Plaintiffs for damages in the amount of $9,273,773.00

## VI. FACTS

### Stanford International Bank

23.    The Plaintiffs made deposits at SIB and purchased certificates of deposit ("**Stanford CDs**").  At the time SIB was placed in receivership, the bank had taken in $7.2 billion in deposits from over 20,000 investors. The Plaintiffs lost $9,273,773.00 of those deposits.

24.    Stanford CDs were carefully crafted to seem like normal financial instruments, bearing favorable but not unreasonable rates of return and a high level of security. Most Stanford CDs purchased by the Plaintiffs bore stated annual rates of return of five to

six percent interest, and came with typical restrictions one would expect to find on a bank CD, such as penalties for early withdrawal.

25.   To market the Stanford CDs, the bank produced elaborate marketing materials including websites, financial statements, and prospectuses. *See, e.g.,* Exhibit "A." R. Allen Stanford built a corresponding network of financial companies including Stanford Financial Group, a registered broker-dealer, Stanford Trust Company, and other companies offering financial services, products, and investments to expand the scope of SIB and the Stanford CD enterprise.

26.   Plaintiffs purchased Stanford CDs through their accounts at Stanford Trust Company ("STC"), which also did business under the name Stanford Fiduciary Investor Services (and other similar names). These trust companies did little, if anything, other than promote the sale of Stanford CDs.

27.   The Trust Companies are now in receivership along with SIB, the broker-dealer, and other Stanford companies. Thus, the trust companies are incapacitated to serve as trustees, and they are unable to prosecute claims related to the Stanford CDs on behalf of their trusts because their role in the sale of CDs gives rise to a conflict.

28.   SIB made a number of vital statements to depositors about the presence of insurance. First, SIB held out to the world year after year that its deposits were secure and that insurance protected the deposits. Second, SIB and the Defendants Winter, BMB, Baranoucky, Willis of Colorado, and Willis Group claimed that the bank underwent "stringent risk management reviews" which formed their bases for providing certain insurance coverages. This statement was patently false. The truth of the matter is that these Defendants never even reviewed the material that they were allegedly relying upon. Third, SIB used its website, financial statements, and prospectuses to publish thousands of times over the names of its risk management and insurance professionals, *i.e.,*

– 13 –

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

Robert Winter, Bowen, Miclette & Britt, Inc., Amy S. Baranoucky, Willis of Colorado, and Willis Group.

29.     The extent to which depositors relied on the presence of insurance to protect their deposits held by SIB cannot be overstated.  For example, in March of 2000, prior to Plaintiffs agreeing to deposit funds with SIB, M. Rishmague repeatedly inquired into the safety and security of investments held with SIB.  On several occassions, M. Rishmague personally met with SIB executives and specifically discussed the existence of certain insurance coverages.  During one meeting at an SIB office which James Davis, Chief Financial Officer of SIB, attended by way of conference call, M. Rishmague was repeatedly assured of the presence of insurance provided by Lloyd's of London and was shown a Safety and Security Letter.  It was only after this meeting and in reliance on the repeated assurances that SIB was adequately insured that the Rishmagues decided to begin depositing funds into SIB accounts under the UCB Properties Trust and Inversiones Misanisa Trust names.

30.     In 2003, Plaintiff M. Rishmague was compelled to visit the SIB bank in Antigua to see the operation first hand.  He personally met with the president of the bank, Mr. Juan Rodriguez-Tolentina, who touted the "extreme liquidity" of the bank and the presence of the insurance coverages as declared in the Safety and Security Letters.  In 2005, M. Rishmague revisited the Antiguan bank to meet with Mr. Juan Rodriguez-Tolentina.  At this meeting, the same assurances and representations were made to M. Rishmague regarding liquidity and insurance coverages, only this time M. Rishmague was informed that Willis, which had now assumed responsibility over the insurance and risk management functions of SIB in place of BMB, had performed an audit on the Bank.  The Willis audit was used by Mr. Juan Rodriguez-Tolentina to reinforce his assurances to M. Rishmague that the UCB Properties Trust and Inversiones Milanisa Trust were safe and secure.

     © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

Indeed Willis itself provided as much each time a Safety and Security Letter was presented to a depositor on Willis' letterhead. Insurance protection was so vital to the Rishmagues' decision to deposit and maintain funds with SIB that, in addition to his personal trips to Antigua and multiple meetings with SIB executives, M. Rishmague also ensured he reviewed a current Safety and Security Letter with his advisor with STC each year since the establishment of the UCB Properties Trust and the Inversiones Misanisa Trusts with SIB in May of 2000 and March of 2001, respectively.

### The Insurance Professionals

31.     BMB and Robert Winter served SIB as insurance brokers and risk management advisors from as early as the mid-1990s and until 2002 or later. They not only purportedly placed coverage for SIB and consulted for SIB on risk management strategy, they also allowed themselves to be listed on SIB's financial statements as "Insurance and Risk Managers" (subscribing to and further validating the information contained in the financial statements) and personally published information about certain insurance coverages to the Plaintiffs by sending out thousands of "Safety and Security Letters" as part of and in conjunction with SIB's marketing scheme.

32. .   Willis Group, Willis of Colorado, Willis of Texas (collectively "Willis"), and Amy Baranoucky undertook a similar role for SIB, serving as insurance brokers and risk managers from 2002 through 2005, and sending out similar letters.

33.     The Safety and Security Letters are well crafted for their purpose – to perpetuate fraud. The letters sent on BMB stationary were signed by insurance broker and BMB employee, "Robert S. Winter, Financial Specialist," at a firm which purported to offer services in "Insurance/Bonds/Risk Management." The letters say that based on Winter and BMB's knowledge, SIB was composed of "first class business people." The letters specifically describe up to four different types of insurance coverage placed at allegedly "A" rated underwriters, *i.e.*, Lloyd's of

London, General Star Indemnity, and Great American Insurance, Co. The letters describe risk management reviews (sometimes described as "stringent" risk management reviews) by an outside firm, and the letters make it clear that the risk management reviews were material to obtaining the represented coverage.

34.     Remarkably, the Baranoucky and Willis letters use the same language as the BMB and Winter letters. Baranoucky and Willis' letters continued to tout the benefits of "stringent risk management reviews" and the "first class business people" at SIB.

35.     The Safety and Security Letters were a *quid pro quo* given by Willis and BMB to SIB in exchange for the privilege of selling insurance to Stanford and his entities and collecting a handsome commission. BMB and Willis knew that SIB and Stanford used the Safety and Security Letters to ensure that a critical mass of depositors would keep their monies with SIB. The Safety and Security Letters were either addressed to individual depositors or distributed in mass to the remaining depositors. These letters were a part of the marketing campaign used to give SIB credibility while it continued to take in new deposits and promote the classic Ponzi scheme.

### The Business of Insurance

36.     The Insurance Defendants engaged in conduct constituting the business of insurance in Texas. Among other things, the Insurance Defendants:

> a.   made and proposed to make insurance contracts;
>
> b.   made and proposed to make guaranty or surety contracts;
>
> c.   took or received insurance applications;
>
> d.   received premiums and commissions;
>
> e.   issued and delivered insurance contracts to residents of this state;

f.   assisted insurers and persons in soliciting, negotiating, procuring and effectuating insurance and renewals of insurance;

g.   assisted insurers and persons in disseminating information relating to coverage;

h.   assisted insurers and persons in transacting a matter after the effectuation of the contract; and

i.   did and proposed to do insurance business that was in substance equivalent to conduct described at TEX. INS. CODE § 101.051(b)(1)-(8) in a manner designed to evade statutes relating to insurance.

This conduct in the business of insurance was part-and-parcel of the Insurance Defendants' misrepresentations to the Plaintiffs. Thus, each use (*e.g.*, mailing or display) of a Safety and Security Letter by the Insurance Defendants to Plaintiffs, each failure to correct a misstatement which the Insurance Defendants had a duty to correct, and many other acts by the Insurance Defendants were also conduct in the business of insurance.

37.   The Safety and Security Letters misrepresented the benefits of the insurance policies held by SIB. The letters were sent to Plaintiffs to encourage them to leave their money at SIB. The insurance professionals who sent these letters intended for Plaintiffs to believe that these purported policies contained in the letters would protect the Plaintiff when, in fact, the policies protected only SIB and its sole shareholder, R. Allen Stanford.

38.   The Safety and Security Letters used a name or title of an insurance policy that misrepresented the true nature of the policy. The letters describe policies or coverages using terms such as "Bankers Blanket Bond," "Excess FDIC Insurance," and "Depository Insolvency" in order to lead the Plaintiffs and other depositors to believe that their deposits at SIB would be covered when, in fact, they were not. Use of each these terms were stand alone misrepresentations in and of themselves because no such coverage or protection against Plaintiffs' loss existed when these representations were made. To the extent that any of these coverages did actually exist, then, upon

information and belief, such coverages were wholly inadequate to represent that such coverage protected the depositors interests.

39.     The Safety and Security Letters contained further untrue, deceptive, and misleading representations regarding SIB, the Insurance Defendants, and the business of insurance. The Safety and Security Letters made untrue statements of material fact. Among other things, SIB was not made up of what any reasonable person would call "first class business people." There were no risk management reviews, or in the alternative, what reviews there may have been were far from "stringent." Further, any reviews that allegedly were relied upon by the Insurance Defendants were so antiquated that reliance thereon cannot justifiably serve as any bases for: (1) continued placing of the purported coverages by the Insurance Defendants; and (2) continued distribution of the Safety and Security Letters to depositors or potential depositors of SIB in knowing perpetuation of the SIB scheme.

40.     Baranoucky, Willis of Colorado, and Willis Group sent out their letters from an office in Colorado. By sending out these letters, they engaged in deceptive practices as part of their business, vocation, and occupation. The letters impacted the public as customers of Baranoucky, Willis of Colorado, and Willis Group's goods and services, namely financial products and Stanford CDs backed by their insurance products.

*Professional Duty*

41.     Professionals such as the Defendants owe a duty to non-clients who could be harmed by their actions and/or omissions. All the Defendants were working as professionals when they sent Safety and Security Letters to the Plaintiffs or to financial advisors who the Defendants knew were instructed to use the letters to mislead SIB depositors such as Plaintiffs, knowing that the Plaintiffs, and others, would rely on the representations contained therein when considering whether or not to

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

purchase Stanford CDs. The letters gave false information about many things, most notably the type and extent of coverages available, the quality and existence of the risk management reviews, and the character of the business people at SIB. This information was given for the guidance of the Plaintiffs. The Defendants did not exercise reasonable care when they failed to establish the truth of their statements in these letters. The Plaintiffs relied upon the Defendants' misrepresentations when deciding to deposit money at SIB, and now have been injured therefrom. Further Winter and Baranoucky were acting in the course and scope of their duties as employees at BMB, Willis of Colorado, and Willis Group when they made their misrepresentations that harmed the Plaintiffs while earning handsome commissions for their employers and themselves.

42.     Having represented to the Plaintiffs and other depositors by letters and SIB financial statements that certain insurance coverage would be in effect and having worked closely with SIB, the Insurance Defendants had a duty to place, effect, maintain, or renew insurance coverage that would protect the Plaintiffs' deposits. The Insurance Defendants failed to place, effect, maintain, or renew this coverage.

43.     The Insurance Defendants had a duty to service the insurance and risk management accounts at SIB for policies related to the Stanford CDs. The Insurance Defendants should have serviced their insurance and risk management accounts at SIB by advising SIB on appropriate risk management policies, by advising SIB on appropriate controls to retain the benefits of insurance coverage, and by monitoring SIB and assisting SIB in monitoring compliance with these policies. The Insurance Defendants did not undertake appropriate action to inform or advise the appropriate SIB personnel of their obligations under the policies or to facilitate communication between SIB and its insurers. The Insurance Defendants failed to service their accounts with SIB by failing in their obligations to assist SIB in filing claims against its insurer related to the Stanford CDs.

     © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

*The Co-Trustee Defendants*

44.     Aleman Trust Company, the Aleman Firm, and Jaime Aleman (the "Co-Trustee Defendants") all played critical roles in the sale of Stanford CDs to the Plaintiffs.  Aleman Trust Company served as co-trustee on many trusts, including those at issue in this lawsuit, for which Stanford Trust Company Limited d/b/a Stanford Fiduciary Investor Services and Stanford Trust Company, Inc. served as trustee.  Plaintiff O. Rishmague was the settlor and primary beneficiary of the UCB Properties Trust and the Inversiones Misanisa Trust. · Plaintiff M. Rishmague was an ultimate beneficiary of these trusts.  While Aleman Trust Company was serving as co-trustee of these trusts, the Aleman Firm (whose partners appear to be the principals of Aleman Trust Company) continued to represent SIB and its affiliates, including Stanford Bank Panama.  Thus, the Aleman Trust Company was taking on fiduciary duties to the settlor and beneficiary Plaintiffs which necessarily required it to cast the jaundiced eye and scowling mien of a fiduciary upon the clients of the Aleman Firm; this could not be done, and in fact, was not done.  Jaime Aleman personally oversaw these series of acts and omissions, and in many cases, personally executed trust documents.

45.     By order of the United States District Court for the Northern District of Texas, Stanford Trust Company resigned or was removed as fiduciary for all "STC fiduciary accounts," "upon the appointment of a successor fiduciary."[1]   Other designated co-trustees such as Aleman, Cordero, Galindo & Lee Trust ("Aleman") are incapable of representing the interests of the trust and its beneficiaries.

46.     Aleman Trust Company owed fiduciary duties of loyalty and care to the trusts at issue in this lawsuit and their settlors and beneficiaries.  Aleman Trust Company breached its duty of

---

[1] *Securities and Exchange Commission v. Stanford International Bank, et. al.*, No. 3:09-cv-00298 (N.D. Tex., Apr. 23, 2009)(order establishing, inter alia, the resignation of Stanford Trust Company as fiduciary).

   © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

loyalty by working harder to maintain its profitable relationship with SIB and STC than to look after the interests of the trusts and their beneficiaries. Aleman Trust Company breached its duty of care by failing to make a reasonably prudent investigation of the affairs, assets, and liabilities of SIB, especially in light of the large amount of business it did with SIB. As co-trustee, Aleman Trust Company had an obligation to see that STC would not commit a serious breach of trust, and an obligation to compel STC to redress serious breaches of trust.

47. Aleman Trust Company made profits through or arising out of the administration of the trust. The trusts suffered losses resulting from the trustee's failure to perform its obligations as trustee.

48. Aleman Trust Company, the Aleman Firm, and Jaime Aleman were essential links in the chain that lead to the sale of Stanford CDs. These Co-Trustee Defendants made false representations of material fact and omitted to state facts necessary to make other statements not misleading under the circumstances in which they were made.

49. Had the Co-Trustees not committed breaches of trust, the trusts at issue in this lawsuit would have accrued profits.

### Conditions Precedent

50. All conditions precedent have occurred and/or have been waived.

## VII. CAUSES OF ACTION

### A. Violations of the Texas Insurance Code

### Count 1 – Misrepresenting the benefits of insurance policies – TEX. INS. CODE § 541.051(1).

51. The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 50.

52. The Insurance Defendants committed unfair or deceptive acts or practices in the business of insurance when the Insurance Defendants made, issued, and circulated statements

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

misrepresenting the benefits or advantages promised by an insurance policy. In the alternative, the Insurance Defendants caused such statements to be made, issued or circulated.

53.     The Insurance Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs.

54.     The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

55.     The Insurance Defendants knowingly committed the complained of acts.

56.     The Insurance Defendants are liable to the Plaintiffs for treble damages.

*Count 2 – Misrepresenting the name or title of insurance policies – TEX. INS. CODE § 541.051(4).*

57.     The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 56.

58.     The Insurance Defendants committed an unfair or deceptive act or practice in the business of insurance when the Insurance Defendants used a name or title of a policy or class of policies that misrepresented the true nature of the policy or class of policies.

59.     The Insurance Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs.

60.     The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

61.     The Insurance Defendants knowingly committed the complained of acts.

62.     The Insurance Defendants are liable to the Plaintiffs for treble damages.

*Count 3 – False information and advertising – TEX. INS. CODE § 541.052.*

63.     The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 62.

64.     The Insurance Defendants committed an unfair or deceptive act or practice in the business of insurance when the Insurance Defendants made, published, disseminated, circulated, and

placed before the public certain advertisements, announcements, and statements. These advertisements, announcements, and statements contained untrue, deceptive and misleading assertions, representations and statements regarding the business of insurance and regarding a person in the conduct of the person's insurance business. In the alternative, the Insurance Defendants caused such statements to be published, disseminated, circulated, and placed before the public.

65.     The Insurance Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs.

66.     The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

67.     The Insurance Defendants knowingly committed the complained of acts.

68.     The Insurance Defendants are liable to the Plaintiffs for treble damages.

*Count 4 – Misrepresentation of a policy of insurance – TEX. INS. CODE § 541.061.*

69.     The Plaintiffs reallege and the allegations of paragraphs 1 – 68.

70.     The Insurance Defendants committed an unfair or deceptive act or practice in the business of insurance by misrepresenting insurance policies when the Insurance Defendants made untrue statements of material fact, failed to state material facts necessary to make other statements not misleading considering the circumstances under which the statements were made, and making statements in a manner that would mislead a reasonably prudent person to a false conclusion of material fact.

71.     The Insurance Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs.

72.     The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

     © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

73.    The Insurance Defendants knowingly committed the complained of acts.

74.    The Insurance Defendants are liable to the Plaintiffs for treble damages.

## B. Colorado Consumer Protection Act

*Count 5 –Violation of the Colorado Consumer Protection Act – COL. REV. STAT. 6-1-101, et seq.*

75.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 74.

76.    Amy Baranoucky, Willis of Colorado, and Willis Group engaged in deceptive trade practices.

77.    These practices occurred in the course of Baranoucky, Willis of Colorado, and Willis Groups' business, vocation, or occupation.

78.    These practices significantly impacted the public as actual or potential customers of Baranoucky, Willis of Colorado, and Willis Groups' goods, services, or property.

79.    The Plaintiffs have suffered injury in fact to their legally protected interests.

80.    Baranoucky, Willis of Colorado, and Willis Groups' deceptive practices caused the Plaintiffs' injuries. These Defendants' acts and omissions were links in a chain that lead the to Plaintiffs' injuries. There was a sufficient causal nexus between the Defendants' acts and omissions and the Plaintiffs' injuries despite the intervening acts of others.

81.    Baranoucky, Willis of Colorado, and Willis Group are liable to the Plaintiffs for their damages in the amount of $9,273,773.00.

82.    Baranoucky, Willis of Colorado, and Willis Group are liable to the Plaintiffs for treble damages.

## C. Common Law Claims

*Count 6 – Negligent Misrepresentation.*

83.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 82.

84.   The Insurance Defendants made representations to the Plaintiffs in the course of the Insurance Defendants' business or in one or more transactions in which the Defendants had an interest.   The Insurance Defendants made statements to the Plaintiffs regarding SIB and Stanford CDs. The Insurance Defendants either intended for the Plaintiffs to benefit from this information, or the Insurance Defendants knew or reasonably should have known that the Plaintiffs would receive the information.

85.   The Insurance Defendants supplied false information for the guidance of others.

86.   The Insurance Defendants did not exercise reasonable care or competence in obtaining or communicating the information.

87.   The Plaintiffs justifiably relied on the representations.

88.   The Insurance Defendants' negligent misrepresentations proximately caused the Plaintiffs' injuries.

89.   The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

90.   Defendants BMB, Willis of Colorado, and Willis Group are vicariously liable for all negligent misrepresentations made by their employees, Defendants Winter and Baranoucky.

**Count 7 – Negligent Procurement and Negligent Omission.**

91.   The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 90.

92.   The Insurance Defendants undertook to procure insurance policies for SIB, including third-party policies of insurance for the benefit of the Plaintiffs.

93.   The Insurance Defendants had a duty to maintain or renew insurance for SIB, including third-party policies of insurance for the benefit of the Plaintiffs.

       © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

94. The Insurance Defendants did not exercise reasonable care, competence, or diligence in procuring the policies, or the Insurance Defendants did not exercise reasonable care, competence, or diligence in renewing and maintaining those policies.

95. The Plaintiffs justifiably relied on the Insurance Defendants' representations that appropriate insurance policies had been procured or that such policies had been renewed or maintained.

96. The Insurance Defendants' failure to use reasonable care, competence, or diligence in procuring third-party policies proximately caused the Plaintiffs' injuries. In the alternative, the Insurance Defendants' failure to use reasonable care, competence, or diligence in renewing or maintaining third-party policies proximately caused the Plaintiffs' injuries.

97. The Insurance Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs in the amount of $9,273,773.00.

*Count 8 – Failure to service policies.*

98. The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 97.

99. The Insurance Defendants had an obligation to service the insurance policies held by its customer SIB.

100. The Insurance Defendants failed to service those policies.

101. The Insurance Defendants' failure to service those policies caused the Plaintiffs to suffer losses.

102. The Insurance Defendants are liable to the Plaintiffs for their losses and damages in the amount of $9,273,773.00.

*Count 9 – Fraud by Nondisclosure.*

103. The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 102.

 © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

104.    All the Defendants concealed certain facts from the Plaintiffs, or failed to disclose certain facts to the Plaintiffs. The Insurance Defendants concealed facts or failed to disclose facts relating to the policies of insurance. All other Defendants concealed facts or failed to disclose facts related to their knowledge of the financial condition and practices of SIB.

105.    The Defendants had a duty to disclose the concealed or non-disclosed facts to the Plaintiffs.

106.    The concealed or non-disclosed facts were material.

107.    The Defendants knew that the Plaintiffs were ignorant of these facts, and that the Plaintiffs did not have an equal opportunity to discover these facts.

108.    The Defendants were deliberately silent when they had a duty to speak.

109.    By failing to disclose these facts, the Defendants intended to induce the Plaintiffs to take some action or to refrain from acting.

110.    The Plaintiffs relied on the Defendants' nondisclosure or concealment.

111.    The Plaintiffs were injured as a result of acting without knowledge of the undisclosed facts.

112.    The Defendants' non-disclosure or concealment caused the Plaintiffs' direct damages. The Defendants' non-disclosure or concealment proximately caused the Plaintiffs' consequential damages.

113.    The Defendants are liable to the Plaintiffs for direct and consequential damages for the Plaintiffs' injuries in the amount of $9,273,773.00.

## D.  Claims against Trustees

### Count 14 – Return of Profits Made by Trustee.

114.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 113.

   © 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

115.    The Co-Trustee Defendants served as trustees of the trusts settled by the Plaintiffs.

116.    The Co-Trustee Defendants realized profits through administration of the trusts or arising out of administration of the trusts.

117.    The Co-Trustee Defendants are liable to the trusts settled by the Plaintiffs for the profits made through administration of the trusts or arising out of administration of the trusts.

**Count 15 – Losses From Trustee's Failure to Perform Fiduciary Duties.**

118.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 117.

119.    The Co-Trustee Defendants served as trustees of the trusts at issue in this case.

120.    The Co-Trustee Defendants breached their fiduciary duty of loyalty and duty of care to the Plaintiffs as settlors or beneficiaries of such trusts.  These breaches of fiduciary duties were the proximate cause of damage to the trust estates.

121.    These trusts lost value as a result of these breaches.  Had the Co-Trustee Defendants not breached their fiduciary duties, profits would have accrued to the trusts.

122.    The Co-Trustee Defendants are liable to the trusts settled by the Plaintiffs and their beneficiaries for the losses in value to the trust estate resulting from the breach of trust and for the profits that would have accrued to the trust estate had their been no breach of trust.

123.    The settlor and/or beneficiary Plaintiffs are the proper persons to bring these claims against the Co-Trustee Defendants for losses to the trust estates.  The Defendants are liable to the Plaintiffs for damages in the amount of $9,237,773.

**Count 16 – Appointment of Successor Trustee.**

124.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 – 123.

125.    Aleman, Galindo, Cordero & Lee (BVI) Trust is the trustee of the trusts at issue in this lawsuit.

126. The trustee has breached duties owed to the settlor and beneficiary Plaintiffs of such trusts.

127. The settlor and beneficiary Plaintiffs, parties in interest to the trust, seek removal of the trustee and appointment of successor trustees.

### VIII. JURY DEMAND

128. Plaintiffs hereby demand trial by jury. Payment of the required Jury Fee is tendered to the Court simultaneously with the filing of this Original Petition.

### IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs pray that this Court find the Defendants liable to them for the Causes of Action stated hereinabove, and award them:

    a. damages in the amount of $9,273,773.00;

    b. special damages in the amount of $9,273,773.00;

    c. consequential damages in the amount of $9,273,773.00;

    d. treble damages in the amount of $27,831,319.00;

    e. attorneys' fees;

    f. costs of court;

    g. prejudgment and post judgment interest;

    h. removal of trustees and appointment of successor trustees; and

    i. such other and further relief, both general and special, at law or in equity, to which they may be justly entitled.

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

Respectfully submitted,

**PULMAN, CAPPUCCIO, PULLEN &
BENSON, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Telecopier

By: _____
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Eric A. Pullen
Texas State Bar No. 24007881
epullen@pulmanlaw.com
David Lopez
Texas State Bar No. 12562975
dlopez@pulmanlaw.com
Lance Hunter "Luke" Beshara
Texas State Bar No. 24045492
lbeshara@pulmanlaw.com
Alexander D. Burch
Texas State Bar No. 24073975
aburch@pulmanlaw.com

**ATTORNEYS FOR PLAINTIFFS**

© 2011 PULMAN, CAPPUCCIO, PULLEN & BENSON, LLP

# Exhibit "A"











*Security*

STANFORD INTERNATIONAL BANK goes beyond traditional banking and lending methodology and offers an enlightened, innovative approach—in essence, there is no such thing as discount capital. We put capital to work by investing in what we believe will offer the greatest opportunities for our clients. As a privately held institution, sensitivity value for our customers is our top priority. We never lose sight of what our clients expect of us: putting their interests and premium return ahead of any other stakeholder.

### HARD WORK. CLEAR VISION. VALUES YOU CAN TRUST.

We believe value for clients means value for capital. That's hard work. That's why we seriously manage for a strong balance sheet, a strong cash flow and a strong return on equity. Further, our risk shareholder reinvests every dollar earned back into retained earnings; an act of foresight that has continuously strengthened our capital base for future growth. And that's why we are able to pay consistent returns to our clients, year after year, through market ups and market downs.

Exhibit "A," Page 3 of 20

LETTER FROM THE CHAIRMAN | *Overview*

Dear Valued Clients and Friends,

On behalf of the Board of Directors, management and staff of Stanford International Bank, I am pleased to highlight the accomplishments and milestones achieved during the Bank's 22nd year of continuous operation.

In 2007 the Bank earned a record profit, generated more revenue than at any time in the Bank's history and also set a new milestone at year end by growing total assets to more than $7 billion.

The year began with robust economic forecasts for a growing global economy. Few people realized the enormous amount of leverage and securitized debt that had been utilized and underwritten by some of the world's largest and most respected banks and investment firms in the U.S. market. The overexpansion of credit and shortsighted investment decisions made in preceding years created a bubble that burst in June. Since then, there has been a continuous flow of negative news related to the U.S. economy. We have all read the stories of multibillion dollar write-offs that these banks and brokerage firms have been forced to make due to the securitized mortgage debt meltdown. We have also seen a continuing exodus in top management, and thousands of employees laid off at these industry giants. The ensuing global credit crisis resulted in central banks cutting interest rates and providing massive liquidity to strained financial markets.

Rumors and fears about what might come next produced tremendous swings in the world market indices. Chaos and confusion were, at times, the rule of the day. This, combined with the U.S. single-family housing market being flooded with foreclosures and tens of thousands of unsold units in the high-rise condo market; record-high oil prices; the war in Iraq reaching its sixth year with a cost to the U.S. economy now measured in trillions of dollars; a growing imbalance of trade in the U.S. despite a sinking dollar; the adverse effects of global climate pattern changes; commodity prices that are completely out of sync; and unprecedented worldwide food price hikes with 37 nations deemed by the UN to be in full-blown food crisis, makes it clear that the United States may be on the road to a recession.

How long will it last, how severe will it be and how will it impact the rest of the world? No one knows for certain. However, there are bright spots. Certainly, the world's petroleum-based economies are enjoying levels of prosperity never seen before, and there are other market segments in emerging and developed economies that are performing well. But to know and understand these markets requires firsthand knowledge. You must roll up your sleeves and do the hard work necessary to fully understand the risk in order to make sound investment decisions. There never has been, and there never will be, an easy way to make money. It requires discipline, knowledge, experience, hard work and plain common sense. When most in our industry were quick to jump on the easy path to perceived big profits in the securitized debt market, we decided not to follow. The reason Stanford International Bank did not get caught in the subprime debacle was very simple; since we could not clearly define the risk, the potential reward became irrelevant. Today, while others in our industry are fighting for their survival, we are growing our business. While others in our industry have seen a complete turnover in management and are grappling with how to develop a new business strategy, our core leadership team remains intact, and our investment philosophy of global diversification remains unchanged. While others in our industry, even the world's largest, have needed to take extreme steps to recapitalize their balance sheets, Stanford International Bank's overall liquidity and tier one capital are stronger today than at any time in our history.

Although our world is far different than the one in which my grandfather lived when the first Stanford company was founded back in 1932, and technology has dramatically changed the way we live and conduct business, the old saying that "the more things change, the more they remain the same" has never been more true. As a company founded in the midst of the Great Depression, a time of despair and negativity, we have a long-proven understanding of how even the most severe down cycles can bring opportunities that yield significant benefits in the long run. This proven, well-grounded approach when making investment decisions and giving investment advice will benefit you, our clients, in these tumultuous times as never before.







